574 A.2d 420

MICHAEL H. KARU, INDIVIDUALLY, AND ON BEHALF OF THE POTENTIAL HEIRS AND BENEFICIARIES OF THE ESTATE OF MORRIS M. KARU, PLAINTIFF–RESPONDENT, v. ARLINE KARU FELDMAN, DEFENDANT, AND FIRST JERSEY NATIONAL BANK, DEFENDANT-APPELLANT, AND JOEL H. FELDMAN, AS EXECUTOR, ADDITIONAL COUNTERCLAIM DEFENDANT.

Argued January 2, 1990—Decided May 29, 1990.

136

*James R. Van Horn* argued the cause for appellant.

*Jon Rory Skolnick* argued the cause for respondent.

*Dennis R. Casale* submitted briefs on behalf of *amicus curiae*, New Jersey Bankers Association (*Jamieson, Moore, Peskin & Spicer*, attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

On May 17, 1985, Morris Karu purchased two $100,000 Certificates of Deposit (CD) and one $50,000 CD from defendant, First Jersey National Bank (First Jersey). On January 29, 1986, Morris Karu died. This case arose from a dispute between two relatives of Morris Karu with respect to ownership of those three CDs. Specifically, on this appeal, Michael Karu, Morris Karu's nephew, alleges that First Jersey wrongfully allowed his uncle to designate Arline Karu Feldman, Morris Karu's sister, as a trust beneficiary of the CDs and later prevented him from deleting that designation by imposing an early withdrawal penalty.

I

When Morris Karu initially purchased his three CDs on May 17, 1985, Michael Karu accompanied him to First Jersey. During August 1985, Morris Karu returned to the Bank with Arline Feldman. He requested that Arline Feldman's name be added to the CDs so that Ms. Feldman would not have access to the funds while he was alive, but that the money would pass to her on his death. Colleen Danella, a representative of First Jersey, testified at trial that Morris Karu had said to her, "I want it where I don't want her to be able to use the money now but when I pass on." Ms. Danella suggested the funds be designated "In Trust For." Accordingly, she typed the words "I/T/F Arline Karu Fieldman" [sic] on the Certificate. The Bank did not assess a penalty for that addition. On July 9,

1985, Morris Karu purchased another CD in the amount of $65,000 from First Jersey, with the designation, in trust for Arline Feldman.

When the three earlier CDs totalling $250,000 matured in November 1985, they were rolled over for an additional six-month period, so that they would mature on May 17, 1986. On January 21, 1986, however, Morris Karu returned to the bank with Michael Karu and asked to delete Arline Feldman's name from all of his CDs. Since the $65,000 purchased in July 1985 CD had just recently matured, he was permitted to delete its I/T/F designation without a penalty in accordance with bank policy. However, Ms. Danella informed him that he would be assessed an early-withdrawal penalty of $5,000–$6,000 if he attempted to delete Arline Feldman's name from the remaining CDs. He chose not to do so, presumably intending to wait until the CDs matured in May 1986.

Two days after his final visit to the bank and before his CDs had matured, Morris Karu suffered a massive heart attack and lapsed into a coma. Michael Karu immediately obtained an order temporarily restraining First Jersey from distributing the three CDs totalling $250,000 that remained designated in trust for Arline Feldman. On January 29, Michael Karu filed a complaint on behalf of himself and other potential heirs and beneficiaries of his uncle's estate against both Arline Feldman and First Jersey. The complaint sought to have the certificates included in the estate based on allegations by plaintiff that Arline Feldman caused Morris Karu to add her name to the CDs through fraud, undue influence, and other means. It also alleged that First Jersey had violated "State and/or Federal law and/or regulations" by allowing Morris Karu to add Arline Feldman's name to the CDs and by not permitting Morris Karu to delete her name from his CDs without penalty.

On January 29, 1986, Morris Karu died. His will named Michael Karu as residuary beneficiary, and Joel Feldman, Arline Feldman's son, as executor. Plaintiff instituted this action

on behalf of himself and the potential heirs and beneficiaries, and not on behalf of the estate. He is the residuary beneficiary under Morris Karu's will and presumably will benefit if the certificates are included in the estate rather than paid to decedent's sister, Arline Feldman. Arline Feldman filed a counterclaim, alleging that plaintiff had used undue influence over Morris Karu in having successfully caused the removal of her name from the $65,000 CD. The estate filed a cross-claim seeking to invoke the will's "no contest" provision against both of the other litigants.

All parties moved for summary judgment. The court denied Michael Karu's and Arline Feldman's motion against each other, finding that their complaint and counterclaim raised legitimate issues of intent that could overcome the presumption in *N.J.S.A.* 17:16I–5 that the form of the account governs. The court also denied plaintiff's summary judgment motion on the estate's cross-claim as not yet ripe.

In support of its motion for summary judgment, First Jersey submitted the affidavit of a Senior Vice President stating that it was the bank's policy to treat deletions of names from CDs, but not additions, as early withdrawals for the purpose of assessing penalties. The court found that First Jersey had complied with federal and state law, as well as its own rules and regulations, policies, and procedures in connection with Morris Karu's CDs. Moreover, it ruled that the decedent had agreed to those rules and regulations by executing the signature cards and accepting the certificates from First Jersey. Finding no disputed questions of fact, the court granted First Jersey's motion for summary judgment and dismissed with prejudice all claims asserted against First Jersey in the complaint. The court rendered that decision orally on January 13, 1987, and filed it on March 25, 1987.

The remaining litigants, Michael Karu, Arline Feldman, and the estate, entered into a final settlement agreement before the court on February 25, 1987. The final agreement provided that

$200,000 of the $250,000 CD money at issue would be released to Arline Feldman directly, and $50,000 would be held in escrow by her attorney for various expenses, including funds payable to the estate, such as reimbursement for inheritance and intervening interest on the CDs. As part of the agreement, Joel Feldman also resigned as executor in favor of Michael Karu. All parties involved in the settlement were to issue each other releases from liability, and the plaintiff agreed to execute a hold-harmless agreement for Arline Feldman and other beneficiaries in the event they were joined in litigation with First Jersey. The court also noted that in any further litigation with First Jersey, title to the $250,000 would not be subject to dispute, and that the Bank would be liable only for its own "misconduct or wrongdoing." The court entered a Consent Order requiring First Jersey Bank to release immediately and distribute the CDs in accordance with the Final Settlement, which First Jersey immediately did.

Plaintiff appealed the grant of summary judgment in favor of First Jersey, and a split Appellate Division panel reversed. The majority found genuine issues of material fact as to whether the Bank's policy regarding withdrawal penalties existed and whether Morris Karu was aware of that policy. The majority raised a cause of action never asserted by plaintiff by suggesting that absent such a policy, or absent notice, First Jersey might be liable for negligent misrepresentation. The court also ruled that *N.J.S.A.* 17:16I–12, which protects banks from liability on payment of multiple party accounts, would not protect First Jersey from a claim based on negligence.

One judge dissented. He argued that the only available cause of action would have been one grounded in contract. That breach of contract claim could have been asserted only by Morris Karu or the estate. Of course, neither Morris during his lifetime nor his estate had asserted any claim against the bank with regard to the CDs. The dissent reasoned that if Morris Karu had transferred the account and incurred a penalty, damages would have been limited to the $5,000 penalty.

Alternatively, under plaintiff's theory that the bank had caused Morris Karu to abandon his intent, the remedy would have been a constructive trust imposed on the CDs for the benefit of the estate. The dissent reasoned, however, that by settling with Arline Feldman, plaintiff had abandoned that claim for relief. "Plaintiff cannot by settling this issue allow the monies to be transferred and then attempt to hold the bank liable for the resulting transfer."

Finally, the dissenting judge recognized that "it is pure speculation that the beneficiaries suffered any loss." If Morris had followed through and changed the account to his own name, he could have disposed of the funds any way he sought fit, even to the exclusion of his potential heirs. He admonished the majority "not to create a new cause of action where none is needed, merely to provide a remedy for an illusive, if not imaginary, loss."

First Jersey filed an appeal as of right pursuant to *R.* 2:2–1(a).[1]

## II

*Rule* 4:46–2 provides that summary judgment shall be entered only when "there is no genuine issue as to any material fact challenged." *See Judson v. People's Bank and Trust Co. of Westfield,* 17 *N.J.* 67, 74, 110 *A.*2d 24 (1954). In his complaint plaintiff alleged that First Jersey violated "State and/or Federal laws and/or regulations" by allowing Morris Karu to add the Arline Feldman trust designation to his CDs and by refusing to permit him to delete the trust designation without imposing a penalty for early withdrawal. Our threshold inquiry, therefore, is whether First Jersey's multiple party ac-

---

[1] Initially, this Court also granted certification on the issue of whether *N.J.S.A.* 17:16I–12, which discharges a financial institution from liability on payment of funds, protects a bank from a claim based on negligence. Because of our disposition of this appeal, we do not reach that issue, and hereby vacate our original order granting certification.

counts, contracts, and specifically its policy regarding the impo-
sition of early withdrawal penalties are consistent with State
and Federal law.

Federal law sets forth the notice that a Bank must give a
depositor before imposing a withdrawal penalty. Regulation Q
of the Board of Governors of the Federal Reserve System
("Regulation Q") provides:

> (a) *Early withdrawal penalty.* At the time a depositor enters into a time
> deposit contract with the member bank, the bank shall provide a written
> statement of the effect of any early withdrawal which shall (1) state clearly that
> the customer has contracted to keep the funds on deposit for the state of
> maturity, and (2) describe fully and clearly how such penalty provisions apply to
> time deposits in such bank, in the event the bank, notwithstanding the contract
> provisions, permits payment before maturity. Such statement shall be express-
> ly called to the attention of the customer. [12 C.F.R. 217.4(a).]

Prior to its 1986 revision, Regulation Q also delineated in-
stances in which a Bank could make payment on a time-deposit
account without exacting a penalty.[2] A bank had the option to
pay a time deposit before maturity without imposing a penalty
when (1) the time deposit funds represented an individual
retirement account or Keough Plan's assets and the individual
for whose benefit the account was maintained attained the age
of 59½ or was disabled; (2) a depositor maintained separate
time deposits in two or more banks that merge. C.F.R. 217.-
4(d)(8). A bank was obligated to pay a time deposit before
maturity without imposing a penalty if the owner of a time
deposit died or the owner of a time deposit account was
declared incompetent. 12 C.F.R. 217.4(d)(9). In addition, that
section provided for the calculation of penalties.

Although Regulation Q sets forth these specific examples of
early withdrawals that will not result in the imposition of a
withdrawal penalty, it was silent with respect to what other
types of transactions constitute early withdrawals, subjecting
the owner to penalties. The Federal Reserve Board, comment-

---

[2]This section was in effect at the time that Morris Karu purchased his CDs,
but was deleted in subsequent regulations. See 12 C.F.R. 217.4.

ing on the subject in a related context, suggested that the question is a matter of bank policy:

The Federal Reserve Board feels that the question of whether any such transaction should be regarded as a payment of a time deposit before maturity is a matter to be considered by the member bank at the time such transaction is proposed and to be determined by such bank in the exercise of its best judgment and in light of the provisions of the law and the Board's regulations. [3 Fed.Banking L.Rep. (CCH) at 15,247 (Aug. 2, 1985).][3]

Both the trial court and the Appellate Division found that First Jersey had fully complied with the federal regulations. We agree. On the face of Morris Karu's CDs is the following statement: "Under Federal regulations, the funds represented by this certificate can be withdrawn before maturity only if the Bank consents and only if the prescribed penalty for early withdrawal is assessed." On the bottom of the face of the CDs is the statement: "See Reverse For Important Information on Maturity and Withdrawal Penalties." The reverse side of the CDs provides, in part, as follows:

DISCLOSURE OF EARLY WITHDRAWAL PENALTY ON TIME DEPOSITS
Federal regulations prohibit the withdrawal of a time deposit before maturity unless (a) the Bank consents to the withdrawal at the time the withdrawal is sought and (b) you pay the Bank a penalty. The only exceptions are: (i) where the time deposit represents an Individual Retirement Account or a Keogh Plan and the individual for whose benefit the account is maintained attains age 59½ or is disabled, and (ii) where, in certain cases, a depositor maintains separate time deposits in two or more banks that merge, and (iii) where an owner of the time deposit dies, and (iv) where an owner of the time deposit is judicially declared to be competent.

Additionally, the reverse side of the CDs sets forth how early withdrawal penalties would be calculated, reflecting that the penalty for early withdrawal would be three months of interest on the amount withdrawn. It ends with the statement "I agree to keep my time deposits on deposit until maturity."

▮ Moreover, consistent with the Federal Reserve Board's commentary, First Jersey established a policy delineating the

---

[3]This provision was effective at the time Morris Karu purchased his CDs. At the direction of the Federal Reserve Board, the section was removed in February, 1988.

transactions that constitute early withdrawals. A Senior Banking Officer at First Jersey explained that it had been the Bank's policy to permit the addition of names to the registration of a CD without exacting a withdrawal penalty, because that transaction did not represent the payment of a time deposit before maturity. He testified that the deletion of a name from a CD required the imposition of an early-withdrawal penalty inasmuch as that transaction constituted the payment of a time deposit before maturity. No contrary evidence was introduced to dispute that contention. There is no question that that policy had been in force and followed at the time that Morris Karu purchased his CD. Hence, we find that First Jersey's policy comports with federal law.

Moreover, we find that First Jersey's policy is consistent with state law governing Multiple–Party accounts. *N.J.S.A.* 17:16I–16 charges the Commissioner of Banking with prescribing regulations regarding the form and content of deposit contracts to "assur[e] to the extent possible that ... [a] contract bears out the intentions of the persons who are named in the account, particularly in respect to the rights of survivorship and whether or not such rights of survivorship are intended to be created." Pursuant to the statute, the Commissioner of Banking promulgated regulations embodied in *N.J.A.C.* 3:1–12.1 to 12.9, specifying the information that a Bank must provide to a depositor of a multiple party account.[4] The regulations, however, do not

---

[4]One regulation sets forth the information that a deposit contract must contain:

(a) The following information must be included in all multiple-party account contracts:

1. A statement that the account is subject to the provisions of the Multiple–Party Deposit Account Act, *N.J.S.A.* 17:16I–1 et seq. (P.L.1979, c. 491).

2. Express provisions that:

i. Identify the type of account; that it, is a joint account, a P.O.D. account, or a trust account; and

ii. Specify the present interests of all parties with an explanation that parties will share equally in the absence of proof of net contribution unless the parties expressly agree otherwise; and

discuss what constitutes a "withdrawal" or limit a bank's power to define that term.

When Morris Karu opened his accounts on May 17, 1985, he executed signature cards acknowledging that he had received and agreed to First Jersey's rules and regulations. Those written regulations contained all of the notice requirements established under *N.J.A.C.* 3:1–12.4, including the statement: "During your lifetime you may alter the form of your account by written notice or order given against us." Hence, First Jersey's rules and regulations expressly consented to by Morris Karu became part of his deposit contract. *Cf. Forbes v. First Camden Nat'l Bank & Trust Co.*, 25 *N.J.Super.* 17, 21, 95 *A.*2d 416 (App.Div.1953) ("The signature card contains the primary terms of the agreement, but rules printed in the passport are a part of the contract."). When he changed the form of his account to include Arline Feldman as a trust beneficiary on November 17, 1985, and thus became subject to the Multiple-Party Deposit Act, he remained bound by these regulations. Thus, inasmuch as Morris Karu's contract with First Jersey—the CD as well as the Bank regulations—contain all of the

---

iii. Specify that unless otherwise provided there is a right of survivorship among parties, but the account must expressly provide for a right of survivorship between or among two or more P.O.D. payees or trust beneficiaries.

3. A statement of no liability to the financial institutions for payments made pursuant to the Act. Any multiple-party account may be paid, on request, to any one or more of the parties, the financial institutions shall not be required to determine net contributions.

4. The necessary form of notice required to effectively change the terms of the deposit contract. Where there is more than one party, that is, joint accounts or two or more original payees in P.O.D. accounts or two or more trustees in trust accounts, the financial institution may require that the party giving the notice pursuant to *N.J.S.A.* 17:16I–6 or *N.J.S.A.* 17:16I–12 provide the current address of every other party affected by the notice if such address is known.

5. An acknowledgement of having read the contract which must be signed by all parties. [*N.J.A.C.* 3:1–12.4].

notice provisions of *N.J.A.C.* 3:1–12.1, we find that First Jersey fully complied with the Multiple Party Deposit Act.

We therefore conclude that First Jersey fully complied with federal and state law. Accordingly, we find no merit to plaintiff's allegations that First Jersey violated federal and state law by allowing Morris Karu to add "I/T/F Arline Karu Feldman" to his CDs or by not allowing him to delete such designation from his CDs without penalty.

### III

Plaintiff's complaint alleged only that First Jersey violated state and federal law. The Appellate Division, however, reasoned that "[t]he theory of plaintiff's case is that the negligence of the bank in giving false information to Morris Karu gives rise to liability, because in the absence of such incorrect or false information, Morris would have removed Arline's name from the account." Hence, although the Appellate Division found that First Jersey had complied with applicable federal regulations, it nonetheless suggested that plaintiff might have a cause of action against First Jersey under the theory of negligent misrepresentation set forth in *Rosenblum v. Adler,* 93 *N.J.* 324, 461 *A.*2d 138 (1983). Specifically, in reversing First Jersey's grant of summary judgment, the Appellate Division reasoned that there is "a genuine question of material fact as to whether [ ] [the bank's early withdrawal] policy[ ] exist[s], and if so, whether Morris Karu was aware of the policy."

A cause of action for negligent misrepresentation may exist when a party negligently provides false information. In *Rosenblum v. Adler, supra,* 93 *N.J.* at 324, 461 *A.*2d 138, we considered whether an accountant who had negligently prepared inaccurate financial statements could be held liable for negligent misrepresentation to a third party who had relied on those statements. The issue in *Rosenblum* was whether a privity relationship between the parties must exist before a court can impose liability. Although holding that liability

would extend to all "reasonably foresee[able] [ ] recipients," *id.* at 352, 461 *A.*2d 138, we noted that "[t]he extent of financial exposure has certain built-in limits." *Id.* at 350, 461 *A.*2d 138. First, we explained that an accountant has a duty to prepare accurate financial statements, and hence, as a threshold issue, a cause of action will exist only for an "incorrect statement[ ] negligently made." *Id.* at 334, 461 *A.*2d 138.

We explained the additional limitations on a plaintiff's cause of action after that initial showing of negligence. The aggrieved party must be a reasonably foreseeable recipient of the company's statements for its proper business purpose, who relies on the statements, *id.* at 352, 461 *A.*2d 138, and the statements must be a proximate cause of the plaintiff's damages. *Id.* at 350, 461 *A.*2d 138. Additionally, we noted that a plaintiff's damages are limited "to recovery for actual losses due to reliance on the misstatement." *Ibid.*

▇ Because this is a summary judgment action, our threshold inquiry is whether, viewing the facts most favorable to plaintiff, First Jersey acted negligently by providing false information to Morris Karu or by failing to apprise him of the correct information. The Appellate Division predicated plaintiff's negligent-misrepresentation theory on those two possibilities. Its first theory was based on First Jersey providing false information to Morris Karu. The court reasoned that if First Jersey's policies regarding withdrawal penalties did not exist, then "[Colleen] Danella's statement to Morris Karu that the removal of Arline Feldman's name from the CD would trigger an early withdrawal penalty may be actionable." The Appellate Division ruled that because there was a genuine question of material fact over whether such policy did in fact exist, summary judgment was inappropriate. We disagree.

The uncontradicted findings of the trial court reveal that First Jersey had established a policy that it followed at the time that Morris Karu purchased his CD. A senior banking officer at First Jersey testified that it had been the Bank's policy to

permit the addition of names to a CD without imposing a penalty, but to exact an early withdrawal penalty when a name is deleted. First Jersey's representative, Colleen Danella, explained that she informed Morris Karu of that policy when he requested that Arline Feldman's name be removed from the CDs. No contrary evidence was introduced to dispute that contention. Viewing the facts most favorable to the plaintiff, it is clear that the Bank did not provide any false information to Morris Karu. Hence, under a "false information theory," we find that the court below erred in recognizing a cause of action against First Jersey based on negligent misrepresentation.

Alternatively, the Appellate Division suggested that Michael Karu might have a cause of action on the theory that the Bank had failed to provide information that it had a duty to disclose. In other contexts, courts have recognized a cause of action based on negligent misrepresentation when a party fails to provide the correct information at a time when it might affect future actions, where there is a duty to disclose. In *Berry v. Playboy Enterprises, Inc.*, 195 *N.J.Super.* 520, 480 *A.*2d 941 (App.Div.1984), *certif. den.*, 99 *N.J.* 231, 491 *A.*2d 720 (1985), the court held that the plaintiff, who alleged that her employer failed to inform her of a health plan that would have covered her husband without a waiting period and whose husband had incurred medical expenses during that period, had pleaded a *prima facie* case for negligent misrepresentation. *Id.* 195 *N.J.Super.* at 527, 480 *A.*2d 941. *Cf. Berman v. Gurwicz*, 178 *N.J.Super.* 611, 619, 429 *A.*2d 1084 (Ch.Div.1981) ("Silence in the face of an obligation to speak may be fraud."); *Jewish Center of Sussex County v. Whale*, 165 *N.J.Super.* 84, 89, 397 *A.*2d 712 (Ch.Div.1978) (absence of affirmative representation does not bar relief for fraud), *aff'd*, 172 *N.J.Super.* 165, 411 *A.*2d 475 (App.Div.1980), *aff'd*, 86 *N.J.* 619, 432 *A.*2d 521 (1981). In discerning First Jersey's disclosure obligations, it is important to bear in mind exactly the information that First Jersey imparted to Morris Karu.

Each CD entered into between Morris Karu and First Jersey sets forth the essential contractual terms clearly and unambiguously: the date of the contract, the term of the contract, the principal amount payable at maturity, the interest rate payable on the deposit, that the CDs would be renewed unless withdrawn within ten days of maturity, that First Jersey had the right not to renew the CDs on thirty days prior written notice, that the funds on deposit can be withdrawn "only if the Bank consents and only if the prescribed penalty for early withdrawal is assessed," the limited exceptions to the early withdrawal penalty provision, and that the penalty for early withdrawal for the Morris Karu CDs would be three-months interest on the amount withdrawn.

Additionally, First Jersey's Rules and Regulations to which Morris Karu expressly assented, see at 145, 574 *A*.2d at 425, contained all the notice requirements established pursuant to the Multiple–Party Deposit Account Act, *N.J.S.A.* 17:16I–16. Specifically, the regulations included the statement: "During your lifetime you may alter the form of your account or stop or vary payment under the account's terms by written notice given to us. Any such written notice or order is effective against all prior alterations."

The issue, therefore, regarding disclosure to Morris Karu is very narrow. Specifically, we consider whether in addition to its otherwise-thorough disclosure, as evidenced by the contractual term printed on the CD and the Bank's rules and regulations, the Bank had the further duty to apprise Morris Karu, when he added Arline Feldman's name to his CDs, of the various withdrawal penalties that could be imposed if at a later date he decided to alter the designation of the CDs. To determine the extent of a Bank's disclosure obligations with respect to that information, we first look for guidance to federal law.

Federal law imposes specific disclosure requirements on banks with respect to early-withdrawal penalties when entering

time-deposit contracts with depositors. Specifically, 12 C.F.R. 217.4(a) requires a bank to provide a written statement of the effect of any early-withdrawal penalty, describing "fully and clearly how such penalty provisions apply." First Jersey fully satisfied that disclosure obligation by including a statement on the back of the CDs, indicating that penalties would be imposed, and explaining how such penalties would be calculated. Federal law does not require a Bank to advise its customers explicitly of its policies regarding what constitutes an early withdrawal. In sum, Federal law sets forth a detailed regulatory scheme imposing on banks the obligation to disclose specific information, and the record reveals that First Jersey fully complied with the applicable law in all respects. Thus we find that First Jersey, having complied with the federal and state disclosure rules, did not have the added duty of disclosing to Morris Karu when he added Arline Feldman as a trust beneficiary to his CDs that if he wanted to delete her name in the future, before his CDs matured, he would be subject to a penalty.

When courts have recognized a duty to disclose information for purposes of imposing tort liability, they have focused on the course of dealings between the parties and the express contractual undertaking, including, for example, the employer-employee relationship. *See Berry v. Playboy Enterprises, Inc.*, *supra*, 195 *N.J.Super.* at 528, 480 *A.*2d 941; *Wells v. Wilbur B. Driver Co.*, 121 *N.J.Super.* 185, 203–05, 296 *A.*2d 352 (Law Div.1972). In our view, considering the nature of the bank-depositor relationship between First Jersey and Morris Karu, First Jersey's only duty was to disclose that information relevant to Morris Karu's pending transactions. Our review of the record reveals that prior to each transaction, First Jersey disclosed that necessary information. When Morris Karu considered deleting Arline Feldman's name as a beneficiary, First Jersey promptly informed him of its policies regarding early withdrawal penalties. When Morris Karu added Arline Feldman's name to his CDs, his concern, as testified to by Colleen

Danella was: "I want it where I don't want her to be able to use the money now, but when I pass on." Therefore, at that time, he did not contemplate deleting her name, and thus First Jersey did not disclose its policies regarding early-withdrawal penalties. Hence, First Jersey did not have a duty to apprise Morris Karu of its policies at a time when those policies were neither anticipated nor relevant to his pending transaction.

Viewing the facts most favorably to the plaintiff—that First Jersey did not apprise Morris Karu, when he added Arline Feldman's name to his CDs, that if in the future he intended to delete her name, he would be subject to early withdrawal penalty—we nonetheless find that First Jersey's conduct is not actionable as negligent misrepresentation. Our review of tort principles as well as guiding principles of federal regulatory law reveals that First Jersey did not have a duty to reveal such information. Hence, the Appellate Division erred in grounding a cause of action against First Jersey in negligent misrepresentation under a "failure to disclose" theory.

Having concluded, as a threshold issue, that First Jersey did not act negligently toward Morris Karu, and hence that summary judgment in favor of the Bank is appropriate, we need not consider whether *N.J.S.A.* 17:16I–12, which discharges a financial institution from liability on payment of funds, protects a bank from a claim based on negligence. Nor do we consider whether Michael Karu, who does not represent the estate and is merely a "speculative beneficiary," has standing to bring this claim. Moreover, we do not address whether plaintiff's cause of action could survive his settlement of the proceeds of the CD with Arline Karu.

Finally, we do not reach the question of whether Morris Karu suffered any compensatory loss. He elected not to change his account or otherwise contest the Bank's position during his lifetime. Because of our disposition on the underlying cause of action, we agree with the dissent in the Appellate Division that

we need not consider the remedy, if any, for plaintiff's "illusive, if not imaginary, loss."

The judgment of the Appellate Division is reversed.

*For reversal*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, and STEIN—7.

*Opposed*—None.