**PERSONNEL POOL OF OCEAN COUNTY, INC., Plaintiff,**

v.

**TRUSTEES OF the HEAVY AND GENERAL LABORERS' WELFARE FUND OF NEW JERSEY, LOCALS 472–172, Defendant.**

Civ. A. No. 92–0226 (MLP).

United States District Court, D. New Jersey.

Oct. 4, 1995.

Gregory Gogo, Trenton, New Jersey, for Plaintiff.

Andrew F. Zazzali, Jr., Zazzali, Zazzali, Fagella & Nowak, Newark, New Jersey, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PARELL, District Judge.

This is an action by plaintiff, Personnel Pool of Ocean County, Inc., a commercial provider of nursing services, seeking ERISA benefits for nursing care provided to the late Mr. Joseph Lebiedz ("the insured"), who was a participant in a non-profit ERISA health and welfare plan administered by defendant Trustees of the Heavy and General Laborers' Welfare Fund of New Jersey, Locals 472 and 172 ("the Fund"). The Court hereby issues its Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a), following non-jury trial. For the reasons stated, judgment will be entered in favor of defendant.

### PROCEDURAL HISTORY

The procedural history may be summarized as follows. The action was commenced in this Court by Petition for Removal pursuant to 28 U.S.C. § 1441 et seq. filed by defendant Fund on January 10, 1992. Attached to the Petition for Removal was a pleading styled "First Amended Complaint", originally filed in the Superior Court of New Jersey, Law Division, Ocean County, by plaintiff Personnel Pool of Ocean County, Inc., d/b/a Medical Personnel Pool, against defendant Fund (incorrectly designated as "Heavy and General Laborer's Funds of New Jersey"), and against defendants Estate of Joseph Lebiedz, Dale Phillips and Pola Hage. The latter defendant, Pola Hage, had previously been dismissed from the action by order entered in the Superior Court dated July 25, 1991. The basis for removal was the Sixth Count of the Amended Complaint which added an ERISA claim against the Fund. It is undisputed that the insured assigned his ERISA benefit rights to plaintiff. (See Exhibit P-13.)[1] This Court has previously ruled that plaintiff thereby acquired standing to sue. (See Memorandum and Order filed herein on February 24, 1993.) Defendants Estate of Joseph Lebiedz and Dale Phillips were not served and did not appear in this action, and on September 10, 1992 the claims against them were dismissed by this Court without prejudice, pursuant to General Rule 30. Only Counts Four, Five and Six of the Amended Complaint asserted claims against the Fund. By Order entered February 24, 1993, this Court granted the Fund's motion for summary judgment on Counts Four and Five alleging state law

---

1. All exhibit references are to exhibits received in evidence at trial. Similarly, references to testimony are to the testimony of witnesses at trial. Stipulated facts contained in the Pretrial Order filed herein on April 29, 1993 are referred to as "PTO, p. —— ¶——."

claims held to be pre-empted by ERISA; and denied its motion for summary judgment on Count Six, the ERISA claim. Accordingly, the case proceeded to trial only on plaintiff's ERISA claim against the Fund.

### FINDINGS OF FACT

The Fund administers an employee benefit plan ("the Plan") which is a self-insured multi-employer welfare plan within the meaning of Sections 1002(1) and 1002(37)(a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. (1988). The Plan by its terms provides certain medical expense benefits. (P–1.) The insured, Joseph Lebiedz, was a participant in the Plan.[2] Plaintiff is a New Jersey corporation with a registered address in Toms River, New Jersey. Plaintiff provided certain nursing services to the insured at his home beginning in July, 1989, and defendant declined the claim for payment for those services on the ground that they were not covered under the Plan. Most of the relevant facts are not in dispute. Where material issues of fact do exist, they are identified and ruled upon in this opinion.

The Plan provides for Major Medical Expense Benefits[3] for certain eligible expenses, defined as follows: "The eligible expenses are the reasonable charges incurred for the following services and supplies which are ordered by a physician and are necessary for the treatment of injuries and sicknesses." Listed "Other Eligible Expenses ... In or Out of the Hospital" include:

> "Nursing Care—Private duty nursing by a registered graduate nurse subject to approval by the Fund's Medical Consultant." (P–1, pp. 22–23.)

The insured was a 66–year old man in July, 1989, who was diagnosed by his treating physician, Dr. Kenneth Ordene, as having insulin-dependant diabetes mellitus, severe anemia and high blood pressure. (P–7, P–5.) He lived in Jackson, New Jersey with a companion named Katherine Lash. He had a "grandniece" named Dale Phillips and a "niece" named Pola. (D–3.) He had been hospitalized for approximately one week in late July, 1989, and was being discharged on July 26, 1989.

On July 25, 1989, the day before his scheduled discharge, Dale Phillips contacted plaintiff by telephone, spoke to plaintiff's client service representative Sharon Rankin, and ordered the services of a registered nurse ("RN") or licensed practical nurse ("LPN") to be provided to him at home. (PTO p. 2 ¶ 7; D–3; Rankin testimony.)[4] Ms. Phillips described his condition to Ms. Rankin, who recorded it on the Client Order form (D–3), as including the following: Diagnosis: "Diabetic—Dysf. kidneys—TIA's"[5] Condition: Activity: "Up with max. assist." Mental: "Confused at times." Bladder/bowel control: "Partial". Vision: "Poor." Special Nursing and Patient Related Duties: "Goes into diabetic coma very easily. Gluco-scan at home." Ms. Phillips described his medications, which Ms. Rankin recorded. Ms. Phillips also requested, and Ms. Rankin recorded on the Client Order in pencil, "Good nurses notes for ins. purposes." Ms. Rankin quoted Ms. Phillips the plaintiff's hourly rates as "RN $32.50 and "LPN $27.50". (D–3.) The billing party, identified by Ms. Phillips, was "Heavy General Laborers Fund ... Beverly (contact)." After that initial telephone contact by Ms. Phillips, Ms. Rankin gave the Client Order to Deborah Jack, plaintiff's senior client service representative, whose job it was to do the "insurance verification." (Rankin testimony.)

---

2. It is undisputed that Mr. Lebiedz was a participant in the Plan, as that term is defined in 29 U.S.C. § 1002(7). It also appears that the Plan as to health benefits is a funded plan, rather than being unfunded. (See P–1 (Plan booklet), p. 49.) The description of Mr. Lebiedz as "the insured" is therefore used herein only for ease of reference, although his technical status was that of "participant".

3. The deductible and co-pay provisions are not at issue here.

4. There was an ambiguity in the testimony on this point, which is discussed infra at note 6.

5. The term "TIA's" is an abbreviation for transient ischemic attacks. Dr. Ordene testified at trial that the insured did not have that condition, but did have evidence of small fixed strokes and was subject to fainting due to his diabetes and/or his cardiac condition.

Deborah Jack testified that her function as an employee of plaintiff at that time was to take the request for services as described in the Client Order, and contact any insurers to find out what was covered, and to report that information to the clients, who were to remain ultimately responsible for plaintiff's charges. On July 26, 1989, with only the Client Order for this insured in hand (D–3), Ms. Jack called the Fund and filled out an internal Client Information form (P–12) based on her conversation with "Beverly" (Beverly Cesar, who also testified at the trial). That Client Information form, as filled out by Ms. Jack, contained the following pertinent entries:

Are there limits on visits? "Subject to review".

What is considered a visit? "8°"

Are RN's covered? "Yes".

Are LPN's covered? "No".

Home Health Aides/Nursing Aides? "No".

Can LPN's be used in place of RN's if under supervision of an RN? "No".

Are the following items necessary with each bill?

Claim form ("X") Dr. Cert. ("X") Nurse Notes ("X").

Additional Notes:

"Approved for two weeks 24° coverage. Temporary approval given by Beverly. Deanne Marques on vacation til 6/14." [sic]

Beverly Cesar, who was a claims examiner for the Fund at that time, testified that she recalled receiving a telephone call from a woman named Dale on July 26, 1989 inquiring about nursing care benefits for the insured, saying that they really needed nursing services for him. Ms. Cesar explained to Dale that Mr. O'Neill, Assistant General Manager, was out ill, and her supervisor, Ms. Marques, the Claims Manager, was on vacation, and that they would be the ones to answer her questions; but at Dale's urging Ms. Cesar said she would try to get them some information. She got a printout and verified the insured's participation in the Fund, as well as the fact that at his age (over 65) his Medicare coverage would be primary and any Fund coverage would be secondary.

Dale then terminated the conversation and said that the nursing service would call.

Approximately ten minutes later Ms. Cesar received a call from plaintiff (Ms. Jack), saying there was an urgent request for nursing care for the insured, and asking Ms. Cesar various questions regarding coverage. Ms. Cesar testified that she responded to those questions by informing plaintiff, *inter alia*, that RN services, *not* LPN's or aides, were covered under certain conditions including that they be (1) medically necessary; (2) not of a custodial nature; and (3) subject to approval by the Fund's Medical Consultant, Dr. DiPaolo. Ms. Cesar testified that she specifically stated during that conversation that she did not have authority to approve any coverage, and that any further information would have to be obtained from her supervisor, Dina Marques, the Fund's Claims Manager, when Ms. Marques returned from vacation. Ms. Cesar further testified that during that same conversation, due to the stated urgency of the situation, she put the phone on hold and went to speak with the Fund's General Manager, David Connelly; and then she returned to the line and informed plaintiff that in Dina's absence, plaintiff should "do what they had to do" (meaning give him nursing care), but that any coverage for such care would be subject to the approval of the Fund's Medical Consultant.

Ms. Cesar denied ever supplying plaintiff with a statement that the Fund considered a "visit" to be eight hours. She added that she still works for the Fund and does not now know "what is considered a visit", so she did not supply the "8" answer to that question as written by Ms. Jack on P–12. Significantly, she also testified that at no time during her conversation with Ms. Jack on that occasion did Ms. Jack mention to her that anyone was seeking coverage for 24–hour–a–day nursing care for this insured. In fact, she testified, it was not her impression that plaintiff or the insured were seeking round-the-clock in-home nursing, and she certainly did not and could not have approved such coverage. On cross examination regarding this subject, Ms. Jack acknowledged that she could not testify that she had ever asked Beverly whether 24–

hour nursing coverage was allowed under the Plan. Ms. Jack further admitted that her notation on P–12: "Approved for two weeks 24 hour coverage. Temporary approval given by Beverly," was not a verbatim quote from Ms. Cesar, but was Ms. Jack's own statement, written after her conversation with Ms. Cesar.

The next step in plaintiff's processing of the matter, prior to rendering any services to the insured, was to send its Home Care Supervisor, Barbara Sutera, RN, for a home visit to assess the patient's care needs and doctor's orders, and to obtain executed financial responsibility forms. Ms. Sutera did visit the insured at his residence on July 26, 1989 for those purposes. She testified that the only documentation in her possession at that time was the Client Order (D–3), and the blank forms which she was to prepare. She testified to a lack of recall as to whether she knew at the time of that home visit that the Fund would not cover LPN or aide services.[6]

The persons present at the time of Ms. Sutera's home visit on July 26, 1989 were the insured, who had that day been discharged from the hospital, his live-in companion Katherine Lash, and Dale Phillips. Ms. Sutera testified that the insured was mentally alert and able to provide information but he was very thin and weak. Ms. Lash appeared to be approximately 70 years old, did not participate much in the interview, and did not appear to Ms. Sutera to have the knowledge or ability to administer any medications to him. Ms. Phillips, on the other hand, participated actively in providing medical information about him. According to Ms. Sutera's recollection, Ms. Phillips indicated that she was herself an LPN, who had worked for a

nursing service, but that she did not live there and was not going to provide his care.

The Patient Care Assessment form which Ms. Sutera completed on that occasion, (D–2) was a four-page checklist upon which she recorded information provided by the insured and Ms. Phillips. While at the home Ms. Sutera also telephoned the office of Dr. Ordene, the treating physician, and verified some of the medication prescriptions with his office staff, without speaking directly with the doctor (at least, not that she could recall). Based upon the data thus recorded, Ms. Sutera that same day prepared a "Plan of Treatment" form (P–2), which was then mailed to Dr. Ordene's office, where it was signed by him and returned by mail to plaintiff. Before concluding the initial home visit, Ms. Sutera prepared a Health Insurance Assignment of Benefits form which was signed by both the insured and Dale Phillips (P–13), and a Financial Responsibility form which was also signed by both of those individuals. (D–1.) The latter form guaranteed payment of plaintiff's charges "at the rates described above," and Ms. Sutera had filled in on the lines above: "RN $32.50/hour" and "LPN $27.50/hour." (D–1.) Ms. Phillips indicated to Ms. Sutera that Phillips was very familiar with this type of paperwork because she had worked with an agency similar to plaintiff.

The Plan of Treatment form (P–2), which was entirely completed by Ms. Sutera on July 26, 1989, except for the later affixed signature of Dr. Ordene, contained Ms. Sutera's evaluation that this patient needed "RN nursing care at home 24 hours/7 days a week." She testified that at the time she wrote that conclusion, she had no document or oral statement from Dr. Ordene ordering that type and level of care; rather it was

6. As noted *supra* at note 4, Sharon Rankin received the initial call to plaintiff from Dale Phillips, and recorded on the Client Order form (D–3), the information provided by Ms. Phillips. Ms. Rankin could not recall whether she had checked the boxes for both "RN" and "LPN" at that time RN only as/ins. co.

(which would have indicated an initial request from Ms. Phillips for either type of service), or whether she only checked the box for "LPN". It is undisputed that shortly thereafter, someone employed by plaintiff marked over that section of the form so that it then appeared as follows:

| | CATEGORY EMPLOYEE |
| RN ☑ | LPN(LVN) ☑ | NA ☐ | MA ☐ | LIVE–IN ☐ |

None of the plaintiff witnesses could recall who did that, and none of the witnesses who testified could identify that notation as their own handwriting. Ms. Sutera did not recall whether that notation appeared on the Client Order when she did the home visit assessment on July 26, 1989.

based upon her professional evaluation, as a certified RN, of the medical needs of the patient. This opinion was similarly expressed in the testimony of Lorraine Trabilcy, RN, who was the Administrator of plaintiff at the time.

The itemized services listed in that Plan of Treatment were as follows:

—Monitor cardiac status every shift/check status of hypo & hypertension

—Monitor vital signs and record every shift

—Monitor diabetic status. Glucosan each a.m. and p.m. and as necessary

—Check status of hypo/hyperglycemia

—Assist with ambulation with walker

—Supervise activities of daily living and bathroom privileges as tolerated.

(P–2 [complete words substituted for abbreviations and symbols].) Ms. Trabilcy acknowledged in her testimony that each of those functions, viewed separately and in combination, are services that could properly be performed by an LPN for a patient with the insured's combination of conditions. Ms. Trabilcy further testified, however, that in the case of this patient, it was possible that some of the effects of his medications could appear similar to the symptoms of his conditions, thus making the evaluation of the cause of such symptoms or effects a "complex" case from the nursing standpoint, in her opinion.[7] Further, while Ms. Trabilcy and Ms. Sutera observed in their testimony that the medications required by this patient, including the insulin injections, could have been administered by an LPN or indeed any trained lay-person, still the monitoring of any adverse reactions to the medications that might occur was, in their view properly to be performed only by an RN.[8]

Based upon the data and evaluation described above, plaintiff commenced providing round-the-clock RN care to the insured as of July 26, 1989, at the stated rate of $32.50 per hour, or $780.00 per day. The total figure billed by plaintiff for such RN services, as stipulated by the parties, had reached $15,632.51 when they were discontinued on or about August 18, 1989 following defendant's decline of coverage, which is described below. Thus, the amount in controversy in this case, exclusive of claims for interest, costs, and attorney fees, is $15,632.51. PTO, p. 4 ¶ 17.

Dina Marques was the Claims Manager for the Fund at that time. She had been generally responsible for the claims decisions during the extensive claims history regarding this insured, including for example the coverage approvals of his in-hospital doctor visits by Dr. Ordene, and the coordination of those benefits with the insured's Medicare coverage. Her testimony indicated that prior to July 26, 1989, there had been no claims to the Fund for nursing services for this insured.

Ms. Marques was on vacation as of July 26, 1989, and she testified that when she returned to work on or about August 8, 1989, she received a telephone call from an employee of plaintiff who stated that plaintiff had gotten approval from the Fund for the first two weeks of 24–hour private duty registered nursing care for the insured, and wanted approval for an extension. Ms. Marques expressed surprise to plaintiff, stating that would have been most unlikely, and that any nursing coverage would be subject to approval by the Fund's Medical Consultant. Ms. Marques further testified that the source of her expressed surprise was the fact that without exception, in all of her approximately ten years with the Fund, she had never seen a claim for nursing services in particular being approved without review by Dr. DiPaolo (except for perhaps a single shift, on an emergency basis, subject to DiPaolo's later

---

7. Exhibits P–18 and P–19, published by the New Jersey Board of Nursing, set forth Standards of Practice for the Registered Nurse/Licensed Practical Nurse in the State of New Jersey, respectively. Ms. Trabilcy referred in her testimony to P–19, which states, "The Licensed Practical Nurse works independently in situations relatively free from complexity as a private practitioner in the home...."

8. The prescribed medications and tests, as listed in the Plan of Treatment and explained in the trial testimony of Dr. Ordene, were as follows: Aldomet, Pronestil, Lanoxin and nitro patch for the cardiac condition, and insulin for the diabetes; glucoscan (blood test) to monitor diabetic status, and blood pressure readings to monitor hypertension.

review and approval or rejection); and that she had never seen any claim for 24 hour-a-day nursing coverage approved by the Fund under the Plan. Ms. Marques advised the caller that she would review the matter with Dr. DiPaolo and respond to plaintiff's inquiry.[9]

Ms. Marques did then confer with Dr. DiPaolo and responded to plaintiff by telephone that same week, advising that the Fund would agree prospectively to a total of 4 hours of RN coverage daily, but only, as she put it, for "humanitarian reasons." She testified that plaintiff never to her knowledge submitted any bills for 4-hour-a-day RN coverage. Ms. Marques also stated that she and Dr. DiPaolo reviewed all documents submitted by plaintiff before the Fund issued its decline letter of September 12, 1989 regarding the 24-hour-a-day RN services claim (P-8); and likewise that she and Dr. DiPaolo reviewed any additional documents submitted with Ms. Trabilcy's letter of October 5, 1989 (P-10) requesting reconsideration, before the Fund reiterated its decision on that claim in its letter of October 19, 1989. (P-9.) [10]

Dr. Alphonse DiPaolo, the Medical Consultant for the Fund, who has been a licensed physician since 1954 and is Board-certified in specialties including family medicine and surgery, testified that he did perform the review and decision-making on this claim, based upon the provisions of the Plan and the data received for his review of the claim. He testified that in applying the language of the Plan to a claim for nursing services, he would evaluate whether the services were medically necessary; whether the services required the skill level of an RN, and whether the frequency and duration of services was medically appropriate. Referring first to the two letters signed by Dr. Ordene on July 11 and July 28, 1989 (P-7 and P-5),[11] Dr. DiPaolo testified that the two functions described there, namely the injection of insulin and the testing of blood sugar levels, are very simple and are generally done by the patient or a family member. Likewise, he stated that

9. The Court notes that although neither Ms. Marques at the Fund or Ms. Jack at plaintiff's office could recall the name of the person they spoke with on that date, the Court finds that it was probably Ms. Jack who had this conversation with Ms. Marques. Testimony of Ms. Marques and Ms. Jack; P-11 p. 1, entry of Ms. Jack on 8-8-89. Also, Ms. Trabilcy conferred with Ms. Marques by telephone during that period. Testimony of Ms. Trabilcy; P-11 pp. 1-2, entry of Ms. Trabilcy on 8-9-89.

10. According to the testimony of Ms. Marques, the documents that were in the Fund's file and thus received before issuing its letter of 9-12-89 (P-8) likely included the 7-26-89 Plan of Treatment prepared by plaintiff and signed by Dr. Ordene (P-2), as well as two letters signed by Dr. Ordene dated July 11, 1989 and July 28, 1989 (P-7 and P-5), and plaintiff's bills for the RN services rendered, totalling the $15,632.51 claimed. The additional documents in the Fund's file, and thus reviewed, in connection with its reconsideration determination letter of October 19, 1989 (P-9) included those documents referred to and enclosed in Ms. Trabilcy's letter of October 5, 1989 and attachments (P-10), which included "nursing assessment sheets." Exhibits P-4, P-15 and P-16 are various forms and dates of progress notes during the relevant period, prepared by plaintiff and its nursing personnel. Dr. DiPaolo testified that he reviewed all documentation submitted on this claim, and if those documents were submitted, they were included in his review. On direct and/or cross-

examination at trial, Dr. DiPaolo did direct his attention to all of the documents referred to in this footnote, and his testimony is summarized below.

11. Those letters, addressed "To whom it may concern", stated in their entirety:

"Please be advised that the above named patient is under my care for diabetes mellitus. Mr. Lebiedz will need nursing assistance in his home since he is insulin dependent and his poor vision makes drawing the insulin into the syringes difficult. In addition to his daily insulin regimen, he is also required to test his blood sugar levels every day which nursing assistance will be needed in order to read the correct results.

Please consider nursing assistance for Mr. Lebiedz to maintain control with his diabetes."
(P-7, dated July 11, 1989.)

"I have recently discharged the above named patient from the hospital. I feel it is essential that Mr. Lebiedz have 24 hour around the clock home nursing care. He has poorly controlled diabetes mellitus and requires insulin injections which he is unable to administer himself. He also has severe anemia and high blood pressure, and remains in bed most of the time. I feel he needs continual monitoring by a qualified nurse."
(P-5, dated July 28, 1989.) See summary of testimony of Dr. Ordene, below, for circumstances of the preparation of these letters.

anyone can take a blood pressure reading, and that none of those functions require an RN or even an LPN. Further, he stated, anemia can be produced by chronic kidney failure, and nurses cannot treat anemia, nor did Dr. Ordene's letters indicate any treatment for that condition. Turning to the Plan of Treatment dated July 26, also signed by Dr. Ordene (P–2), Dr. DiPaolo noted that the patient was described as stable, alert and oriented at that time. Dr. DiPaolo next testified concerning each diagnosis, prescription and nursing function set forth in that Plan, and concluded with respect to each entry that either there was no in-home treatment prescribed (such as for the kidneys and anemia); or that the medications and functions could be fully and completely administered and performed by an LPN or a trained layperson, on a periodic basis (such as for the diabetes and high blood pressure).

In sum, Dr. DiPaolo concluded, in his medical opinion none of the data contained in those three documents indicated a medical necessity for RN services, or for 24–hour-a-day nursing services. He did acknowledge that if, as it appeared from those documents, the patient himself was not able to administer his own medical care, the functions noted did need to be performed by someone, but again it was his opinion that the medical situation did not require 24–hour coverage, or assignment of an RN. By way of contrast, Dr. DiPaolo explained that if, for example, kidney failure is present and dialysis prescribed, or continuous intravenous medications are prescribed, neither of which was the case here, a visiting RN would be appropriately assigned, but even then it would be on a periodic visit basis rather than around-the-clock in the home. Further, he agreed that the drugs the insured was taking could cause adverse reactions, (as could any drug), and that some of those reactions could be similar to some of the symptoms of the insured's disease conditions (for example, slurred speech or diarrhea), but he stated that not even an RN could analyze those interrelationships, and any caregiver would at best be able to observe and call the doctor for instructions, which again could be done by someone less skilled than an RN.

There was extensive testimony by Dr. DiPaolo, both on direct and cross-examination, in which he was asked to review in detail the nurses' progress notes (P–4, P–15 and P–16) and to state whether the events and conditions noted there would change his medical opinion as described above. He observed in those documents the medications administered, the glucose and blood pressure tests performed, the vital signs readings (including some abnormally high blood pressure and blood sugar readings), and the activities monitored and assisted (eating, resting, sleeping, walking with assistance, using toilet). His conclusions in those portions of his testimony remained the same; i.e., that the insured did have a medical necessity to receive his medications and to be periodically checked for blood pressure, pulse, vital signs and blood sugar, and that although he did present a variety of medical conditions, the medical functions required for his care were relatively uncomplicated; these could be performed very adequately by periodic attention 3 to 4 hours during each 24–hour period, and did not present a medical necessity for either the skill level of an RN or continuous 24–hour-a-day nursing care.

Dr. DiPaolo also noted that Medicare had turned down a request for paid nursing care for this patient, and that since he was covered by Medicare he could have gone to a nursing home if necessary. However, said Dr. DiPaolo, the lack of family care support in the home was a different problem from the issue which he had to address on behalf of the Fund, which was whether the Plan provided coverage for the requested type and amount of benefits. Having concluded that it did not, Dr. DiPaolo testified that he nevertheless did authorize Ms. Marques to convey to plaintiff verbal authorization, prospectively, for three to four hours of RN services per day, in order to help the insured and his family; but no claim was ever submitted on that basis. Dr. DiPaolo also testified that it was not his function as Medical Consultant to the Fund to examine the patient or to interview the treating physician(s), nor was he contacted by the insured's physician(s) in this case, either before or after declining the coverage, but he testified that if he had been

he certainly would have considered their input in reaching his conclusions.

Dr. Kenneth Ordene was the primary treating physician for the insured during the period in and before July, 1989. He was an endocrinologist who began treating the insured in May of 1987 during a hospitalization for his long-standing (24-year) diabetes condition. After that, Dr. Ordene treated him on a fairly regular basis, primarily for his diabetes, which Dr. Ordene described as "brittle", meaning that the diabetes, which was treated with insulin, was poorly controlled. Thus, Dr. Ordene's treatment notes indicates that the insured had approximately fourteen office visits with him from May, 1987 to May, 1989, as well as hospitalization under his care from May 30 to June 2, July 1 to July 10, and July 20 to July 26, 1989. When Dr. Ordene first saw the insured, during his May, 1987 hospitalization, Dr. Ordene recorded the patient's diagnosis as Type 2 diabetes mellitus, with a cardiac condition of superventricular tachycardia (irregular fast heartbeat), and syncopal episodes (passing out) which Dr. Ordene attributed either to low blood sugar or the cardiac condition. In March of 1988 the insured developed severe anemia and was seen on referral by a hematologist, who at that time prescribed folic acid which helped only slightly. Dr. Ordene's observation was that the cause of the anemia was the insured's chronic disease condition, including the diabetes and poorly functioning kidneys. In May of 1989, the insured's treating cardiologist reported to Dr. Ordene that the insured had a "moderate heart problem," and Dr. Ordene was aware that the insured was on heart medication as well as the insulin which Dr. Ordene was supervising.

At the time the insured was discharged from his hospitalization ending July 26, 1989, Dr. Ordene's discharge summary notes showed diagnoses of: severe anemia, diabetes uncontrolled, chronic organic brain syndrome with lacunar infarcts (a type of small fixed strokes), cardiac arrhythmia and chronic renal insufficiency. Dr. Ordene testified that most of these conditions were long-standing in this patient, although his overall condition had worsened over time. However, the amounts of medications prescribed for these conditions had either remained stable or actually decreased over those two years. Dr. Ordene further testified that in his opinion, as of the July 26, 1989 discharge, the insured was not competent to take care of himself adequately, both because he could not reliably administer his own medication or tests, and because he was incontinent and prone to passing out.

Dr. Ordene testified both on direct and cross-examination concerning the preparation of the three documents which he signed in connection with the claim in issue. The first was his letter of July 11, 1989 (P–7, quoted *supra* at note 11), in which he stated that the insured would need "nursing assistance" to maintain control with his diabetes, referring to his vision difficulties. That letter, he said, was prepared at his office and signed by him at the request of Dale Phillips, who indicated to him that she could not stay home to care for the insured. The next document, plaintiff's Plan of Treatment (P–2), although prepared by plaintiff, was also signed by him at the request of Dale Phillips. That form, which Dr. Ordene signed, contained an order for "RN nursing care at home 24 hours a day/7 days a week." However, Dr. Ordene testified at trial that he did not in fact make that determination—indeed he has never in his medical experience made a determination that a certain level of nursing care is needed. He stated that such a determination is usually made by hospital social services or nursing staff, which he customarily would sign unless he disagreed; but that in this case according to his recollection he did sign this order at the request of Ms. Phillips rather than upon any hospital staff recommendation. Finally, Dr. Ordene also signed his letter of July 28, 1989 (P–5, quoted *supra* at note 11), which stated in part, "I feel it is essential that Mr. Lebiedz have 24 hour around the clock home nursing care.... I feel he needs continued monitoring by a qualified nurse." This, too, he testified, was prepared at his office and signed by him at the request of Ms. Phillips, and it was obvious to him at that time that the purpose of such a letter was to obtain "insurance coverage."

When asked about his own opinion of the insured's care needs as of July, 1989, Dr. Ordene testified that he was not familiar with the distinctions between LPN's and RN's as to the type of care they could provide, but that in his view it would have been advisable that the patient receive his medications and testing every four to six hours from a trained layperson or nursing person, and that someone (not necessarily a nursing professional) monitor him throughout the day and night in case of fainting or falling. Thus, stated Dr. Ordene, as of that time he would not have hesitated to release the insured to a suitable nursing home, if the family had expressed interest in that type of care, which they did not.

Dr. Ordene's records further showed that the insured was hospitalized later in August 1989, and he was also hospitalized from September 25 to October 16, 1989, but that Dr. Ordene was not one of the treating physicians on those occasions.

The insured died on November 25, 1989 (per death certificate, P–17), and there is no allegation against the Fund regarding the cause or timing of his death.

### CONCLUSIONS OF LAW

This Court has jurisdiction over the subject matter of this action pursuant to 29 U.S.C. § 1132(a)(1)(B) and 28 U.S.C. § 1331. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

The issue which has been tried to this Court, sitting without a jury, as contained in the Sixth Count of the Amended Complaint, is whether the plaintiff, as assignee of the insured, is entitled to recover from the Fund payment for round-the-clock registered nurse services rendered by plaintiff to the insured during the stated period, totaling $15,632.51. The facts have been developed upon the full record at trial, and the legal conclusions are as follows.

■ The Supreme Court has determined that in actions such as the present case, involving claims for benefits arising un-

der ERISA plans pursuant to 29 U.S.C. § 1132(a)(1)(B),[12] the appropriate standard of judicial review of the trustee's decision depends upon the language of the trust. In *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court established the rule applicable in § 1132(a)(1)(B) actions, that "[w]here discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion." *Id.* (quoting Restatement (Second) of Trusts § 187 (1959)). However, where the trust agreement does not give the trustee power to construe uncertain provisions of the plan, or to make eligibility determinations, the trustee is not entitled to deference and courts exercise de novo review. *Id.* at 111–12, 109 S.Ct. at 954–55. The "abuse of discretion" standard referred to in *Firestone* is also commonly referred to as the deferential or "arbitrary and capricious" standard, *see Abnathya v. Hoffmann–LaRoche, Inc.*, 2 F.3d 40, 45 n. 4 (3d Cir.1993) ("the 'arbitrary and capricious' standard is essentially the same as the 'abuse of discretion' standard.") Under that standard, "the district court may overturn a decision of the Plan administrator only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'... This scope of review is narrow, and 'the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits.'" *Id.* at 45 (citations omitted).

■ The Agreement and Declaration of Trust governing the Fund in this case states that "[s]ubject to the stated purposes of the Fund and the provisions of this Agreement, the Trustees shall have full and exclusive authority to determine all questions of coverage and eligibility,.... They shall have full power to construe the provisions of this Agreement, the terms used herein and the by-laws and regulations issued thereunder. Any such determination and any such construction adopted by the Trustees in good

---

**12.** Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B) (1988), provides a federal cause of action for suits to recover benefits under employee benefit plans or to enforce the terms of such plans.

faith shall be binding upon all of the parties hereto and the Beneficiaries hereof." The stated purpose of the Fund is that of "providing such benefits as ... are ... authorized, or permitted by law for Participants and their Beneficiaries and in accordance with the provisions herein set forth and the Welfare Plan."[13] This same Fund and Plan were reviewed by the Court of Appeals for the Third Circuit in *Myszka v. Aon Corporation, Heavy and General Laborers Local Unions 472 and 172, et al.,* 39 F.3d 1170 (3d Cir.1994), another case involving a claim for health care benefits, wherein the Court concluded that the Trustees' determination was subject to review under the arbitrary and capricious standard. Following that precedent, as the district court must, and also because the quoted language of the Trust Agreement clearly confers upon the Trustees broad discretion and authority to construe the terms of the Plan, this Court similarly must review the Fund's decision in this case under the deferential standard.

▌ The arbitrary and capricious standard requires the reviewing court to disturb an ERISA trustee's medical benefits interpretation only if the trustee's reading of the plan documents was unreasonable. *See Firestone,* 489 U.S. at 111, 109 S.Ct. at 954–55; *Moench v. Robertson,* 62 F.3d 553, 566 (3d Cir.1995).[14] The Court of Appeals for the Third Circuit has referred with approval to a series of helpful factors to consider in determining whether an interpretation of a plan is reasonable; *see Moench* at 566–67. Those factors are:

(1) whether the interpretation is consistent with the goals of the Plan;

(2) whether it renders any language in the Plan meaningless or internally inconsistent;

(3) whether it conflicts with the substantive or procedural requirements of the ERISA statute;

(4) whether the [relevant entities have] interpreted the provision at issue consistently; and

(5) whether the interpretation is contrary to the clear language of the Plan.

*Id.* (citing *Cooper Tire & Rubber Co. v. St. Paul Fire & Marine Ins. Co.,* 48 F.3d 365, 371 (8th Cir.1995)).

▌ The Fund in this case, acting through its Medical Consultant, did interpret the provisions of the Plan regarding nursing service benefits. His interpretation was that the Plan permitted home visits, by RN's only, to administer specific medical treatments constituting skilled nursing care. (P–8, P–9.) He also required, but did not consider the Fund bound by, doctor's orders specifying the need for such services. Applying the above factors to this interpretation, this Court cannot conclude that it was unreasonable.

The first and fifth factors are met in that the goals of the Plan are to provide those benefits permitted by the Plan in accordance with its provisions, and the express language of the Plan provides limited benefits in this category: "The eligible expenses are the reasonable charges incurred for the following services ... which are ordered by a physi-

---

**13.** The quoted language is from the Restated Agreement and Declaration of Trust—Heavy and General Laborers' Local Union 472 and 172 of New Jersey Welfare Fund, dated December 16, 1975, marked Trial Exhibit D–15 for identification and referred to by defense counsel at trial without objection, although not offered in evidence. The Plan was presented at trial, as stipulated Exhibit P–1, in the form of a booklet for participants entitled "Summary Plan Description as of November 1, 1986." There were no relevant regulations or bylaws brought forth by either party at trial, and it appears that none exist, so that the only relevant benefit provisions are those contained in the Plan itself.

**14.** This case does not present the more complicated situation where a benefit plan gives discre-

tion to an administrator or fiduciary, such as an insurance company, which is thereby operating under a conflict of interest. In such cases, "that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone,* 489 U.S. at 115, 109 S.Ct. at 957, (quoting Restatement (Second) of Trusts § 187, Comment d (1959)); *see also Brown v. Blue Cross and Blue Shield of Alabama,* 898 F.2d 1556, 1559–1566 (11th Cir.1990). Rather, in this case the Plan health benefits are self-insured and are administered by the Fund itself. Thus, the Trustees of the Fund are both the fiduciaries and the administrators of the Plan. The Fund's Medical Consultant, Dr. DiPaolo, referred to in the Plan, works for the Trustees of the Fund.

cian and are necessary for the treatment of injuries and sicknesses.... Private duty nursing by a registered graduate nurse subject to approval by the Fund's Medical Consultant." This language and its expressed purpose is to ensure that only the skill level of RN care, and only if and when medically necessary, would be covered under the Plan. To interpret such language otherwise would expose the Fund to unauthorized depletion, to the detriment of its other participants. Similarly, the second and third factors are satisfied by this interpretation, as a thorough reading of the Plan and consideration of the substantive and procedural requirements of ERISA discloses *no conflict or inconsistency* with this interpretation. Finally, as to the fourth factor, it is undisputed that the Fund's interpretation has been consistently articulated and applied through the years; Ms. Marques testified that in her more than ten years with the Fund administration she had never seen 24–hour–a–day nursing services approved. Likewise, Dr. DiPaolo clearly articulated in his testimony and in his contemporaneous communications with plaintiff the distinction between the types of services rendered to this insured and those that he would regard as skilled nursing care, requiring registered nurse services, for example, "[i]t would be considered so if the patient was receiving intravenous medications with blood pressure titrations." (P–9, DiPaolo letter to plaintiff dated October 19, 1989.)

Plaintiff argues that the terms of the Plan in this regard were not sufficiently explicit, and that there were inadequate standards, which should have been set forth in writing either in the Plan or elsewhere, to better inform participants what types of nursing services were covered. This argument is unpersuasive, however, given the clearly restrictive language of this type of benefit coverage, and the express requirement of approval by the Medical Consultant. The determination of medical necessity for the limited type of nursing services covered was expressly reserved to the Medical Consultant under the Plan, to be conducted on a case-by-case basis. It is noteworthy that this is the only type of "Other Eligible Expenses" listed in the Plan which was expressly made subject to such approval. The obvious reason, as cogently argued in defendant's trial brief, was that to permit otherwise would create a "new growth industry" at the expense of trust funds such as this Welfare Fund. (Pl. Tr.Br., p. 10.) At a rate of almost $800 per day, if allowed, the amount and skill level of the at-home nursing services at issue in this case were clearly a type of expense which the Trustees would be and were required to monitor carefully under the Plan, on a case-by-case basis. Thus, it cannot be held that the Fund's interpretation of this provision of the Plan was arbitrary or unreasonable.

The primary argument advanced by plaintiff is that the Fund did not properly apply the provisions of the Plan in this particular case, because the insured was in need of 24–hour–a–day RN care and therefore this claim should have been approved. Here, again, as with the Fund's interpretation of the Plan's provisions, judicial review of the Fund's determination of plaintiff's claim must be conducted under the abuse of discretion standard. Plaintiff contends that because the insured's condition was unstable, because he was taking various medications, because he needed ongoing monitoring as to his physical condition and also for adverse reactions to the medications, it was therefore medically necessary for him to receive 24–hour–a–day RN care, and the claims should have been approved. (Def.Tr.Br., p. 14.)

Plaintiff produced the testimony of its own employees, themselves experienced RN's, in support of this contention. Plaintiff also produced the treating physician, Dr. Ordene, but his testimony fell short of supporting the conclusion. The most that he could confidently state was that the insured had become no longer competent to care for his own medical needs and that he needed someone with him who would be able to assume that responsibility, although Dr. Ordene believed it could be done competently by an LPN or even a trained family member. Since there was no such person available, Dr. Ordene testified that he would have been pleased to release the insured to an appropriate nursing home (he did not specify at what level of nursing skill), but the insured's family had not proposed that. The testimony of Dr. Ordene further revealed that he provided his

signature on all three of the documents which he did sign in this case at the request of the insured's relative, Ms. Phillips, without making any independent evaluation as to whether an RN or lesser level of skill was medically indicated. In fact, he testified, he had never in his career had occasion to do so but rather had generally accepted the recommendations of hospital staff, which he did not receive in this case. Even his two letters, of July 11 and July 28, 1989 (P–7, P–5) which were drafted with his knowledge that they were for "insurance purposes", did not go so far as to order the 24–hour–a–day *RN* coverage expense which plaintiff provided and seeks to recover.

In a case such as this, where the trust agreement clearly gives the trustees the exclusive right to construe the plan and determine all questions of coverage and eligibility, a statement by the treating physician that services are medically necessary, while required under the Plan, does not automatically entitle the member to coverage. *See, e.g. Sheppard & Enoch Pratt Hospital v. Travelers Insurance Co.*, 32 F.3d 120, 124 (4th Cir.1994). Approval by the Medical Consultant on behalf of the Fund was still necessary. The opinion testimony of plaintiff's employees and of Dr. Ordene, and their contemporaneous communications with the Fund at the time of the claim, do not suffice to demonstrate that the decision of the Fund on this claim was an abuse of discretion in this case.

Another argument urged by plaintiff in the course of this action was that defendant was estopped to deny the validity of the claim because its employee, Beverly Cesar, had given express verbal approval of 24–hour–a–day RN care during plaintiff's initial telephone contact with the Fund on July 26, 1989. That argument was identified as a disputed material fact issue in this Court's decision of February 24, 1995, denying defendant's motion for summary judgment. However, the uncontested evidence at trial disposed of that issue in favor of defendant.

Ms. Cesar testified that she did not have the authority to approve any nursing coverage, and had so stated to Ms. Jack, and that she was never asked by Ms. Jack nor gave any approval for 24–hour–a–day coverage. Ms. Jack candidly admitted, under oath, that her notation on her internal worksheet (D–3): "approved for two weeks 24° coverage. Temporary approval given by Beverly ...," was not a statement by Ms. Cesar but rather was Ms. Jack's own conclusion, written after her conversation with Ms. Cesar had ended. On this state of the record, the Court concludes that there is no longer any factual issue regarding estoppel here, and accordingly does not reach the legal question of whether and under what circumstances an estoppel may arise under ERISA.

The trial record is clear that Dr. DiPaolo, the Medical Consultant for the Fund, made a thorough review of all documentation and information submitted to the Fund by plaintiff in support of its claim as assignee of the insured. His medical opinion was based upon essentially accurate information concerning the condition of the insured, including the medications, testing and monitoring that the insured required; and Dr. DiPaolo's own knowledge and experience in interpreting and applying the nursing care provisions of the Plan. The action by the Fund was timely and adequately communicated to plaintiff.

Based upon all of the evidence adduced at the trial, this Court concludes that under the deferential standard to be applied in this case, the decision not to approve the claim was reasonable and not arbitrary, under the provisions of the Plan. Accordingly, judgment will be entered for defendant dismissing the action with prejudice and with costs to the prevailing party.

An Order for Judgment accompanies this opinion.

## ORDER FOR JUDGMENT

This matter having been tried to the Court by Gregory Gogo, Esq. on behalf of Plaintiff, and Andrew F. Zazzali, J., Esq. on behalf of Defendant; and the Court having issued its Findings of Fact and Conclusions of Law in a separate opinion of this date; and good cause appearing,

**IT IS** on this 4th day of October, 1995,

**ORDERED AND ADJUDGED** that judgment is hereby rendered in favor of defendant, dismissing the remaining claim in this action with prejudice, and with costs to defendant to be taxed by the Clerk.

Defendant shall have leave to apply for attorney's fees, in the manner provided by statute and the rules of this Court.