**Virginia McCALL, Plaintiff,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY, UHC Management Company, Chevron Corporation, Chevron Medical Plan Corporation, and Meadow View Nursing and Convalescent Center, Defendants.**

**MEADOW VIEW GERIATRICS, INC., Plaintiff,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY, Chevron Corporation, Chevron Medical Plan Corporation, Healthmarc, Inc., Virginia McCall, Daniel McCall, and George McCall, Jr., Defendants.**

**Civil Action No. 94–5654 JBS.**

United States District Court,
D. New Jersey.

Dec. 16, 1996.

Philip B. Seaton, Richard M. Cohen, Kozlov, Seaton, Romanini & Brooks, Cherry Hill, NJ, for Virginia McCall.

B. John Pendleton, Jr., David W. Opderbeck, McCarter & English, Newark, NJ, for Metropolitan Life Insurance Company.

Siobhan E. Moran, Sondra Modell Hirsch, Law Office of Joseph Trovato, Metropolitan Life Insurance Company, Fairfield, NJ, for Metropolitan Life Insurance Company.

William F. Keating, Angelini, Viniar & Freedman, Woodbury, NJ, for Meadow View Geriatrics, Inc.

David F. Luvara, Mesirov, Golman, Jaffe, Cramer & Jamieson, Haddonfield, NJ, for Healthmarc.

Bruce Lawrence Harrison, Capehart & Scatchard, P.A., Mt. Laurel, NJ, for Chevron Corporation and Chevron Medical Plan Corporation.

## OPINION

SIMANDLE, District Judge:

This case arises under the Employee Retirement Income Security Act ("ERISA"), codified at 29 U.S.C. § 1001 *et seq.* Although the factual setting of the case is relatively complex, the parties essentially seek a judicial determination of who properly bears the responsibility of paying for medical costs incurred by Virginia McCall prior to her recent death. Presently before the Court are cross-motions for summary judgment, brought pursuant to Fed.R.Civ.P. 56 by Meadow View Geriatrics, Inc. (joined by Virginia McCall) and the Metropolitan Life Insurance Company (joined by Healthmarc). As explained herein, the motion brought by Meadow View Geriatrics, Inc. is denied, and the motion brought by the Metropolitan Life Insurance Company is granted in part and denied in part.

### I. *Background*

#### A. *The Parties*

Prior to her recent death, Virginia McCall was a beneficiary under the Chevron Corporation Medical Plan (the "Plan"). (Aff. of James Potts ¶ 10). Mrs. McCall was eligible for participation in the Plan because her late husband had worked for a corporation that subsequently merged with the Chevron Corporation ("Chevron"). (*Id.*).

The Plan is an employee-benefit plan that provides benefits to eligible participants from a trust to which Chevron and its employees contribute. (Aff. of Precilla Williams ¶ 2). The Plan grants to Chevron "full, exclusive and discretionary authority to ... construe the terms of the Plan and determine all issues relating to coverage and eligibility for benefits and take such other action to administer the Plan as it deems appropriate in its sole discretion." (Sumortin aff., Ex. A § 11(b)). The Plan, however, also permits Chevron to "engage other persons ... to perform services with regard to [Chevron's] responsibilities under the Plan. To the extent that [Chevron] delegates fiduciary functions to other persons, such persons shall have the same discretionary power and authority to perform such functions as [Chevron]." (*Id.* at Ex. A § 11(d)).

Chevron has granted to the Metropolitan Life Insurance Company ("Met Life") the authority to review claims for benefits under the Plan. (Sumortin aff., Ex. A § 14, Ex. C, Ex. D). Thus, Met Life is the Plan's claims administrator. In that role, Met Life reviews and processes claims made upon Plan funds. (Aff. of Precilla Williams ¶ 2).

Defendant Healthmarc, a division of UHC Management Company, Inc., has a contract with Chevron pursuant to which Healthmarc reviews health services provided to Plan beneficiaries and makes recommendations concerning the medical necessity of those services. (*Id.,* ¶ 3).

Meadow View Geriatrics, Inc. ("Meadow View") is a nursing home that provides medical services to patients for a fee. (Greenberg dep. at 70).

#### B. *The Chevron ERISA Plan*

Two ERISA plans are implicated in this case: Chevron's Plan as it existed from July 1, 1993, to January 1, 1994 (the "1993 Plan"), and that same Plan as amended post-January 1, 1994 (the "1994 Plan"). (Williams aff. ¶ 7; Sumortin aff. ¶ 2).

#### 1. *The 1993 Plan*

From July 1, 1993, to January 1, 1994, McCall's medical expenses were covered by the 1993 Plan. That plan covered, in relevant part, medical costs incurred at "a Skilled Nursing Facility for room and board and up to the cost of semi-private room and board accommodations for up to 100 days each calendar year." (Williams aff., Ex. A § 7(b)(1)). One of the issues in this case is whether McCall was covered under the Plan for medical services rendered at Meadow View, presenting the question whether Meadow View is a "Skilled Nursing Facility." The 1993 Plan defined a "Skilled Nursing Facility" as

> an institution that, for a fee, furnishes room and board and nursing services for medical care; has one or more licensed nurses on constant duty under the supervision, on a 24-hour basis, of a Registered Nurse (R.N.) or of a physician legally licensed to practice medicine and surgery;

has available, at all times, the services of a physician legally licensed to practice medicine and surgery; complies with all legal requirements applicable to the operation of such an institution; and maintains medical records on all patients at all times.

(*Id.* at Ex. A § 17(a1)). The 1993 Plan further provided that notwithstanding any other provisions in the Plan, the maximum benefit that the Plan would pay for any beneficiary over that person's lifetime was $1,000,000. (*Id.* at Ex. A § 9(g)).

2. *The 1994 Plan*

Beginning on January 1, 1994, McCall was covered by the 1994 Plan and the supplement to that Plan that applied to those beneficiaries whose medical payments were made primarily by Medicare. (Sumortin aff. ¶ 2; Potts aff. ¶ 10; Sumortin aff., Ex. B. §§ 1, 2). The 1994 Plan, as it applied to McCall, provided in relevant part that it would pay "80% of the Coinsurance Amount which Medicare does not pay … for Medicare-covered services provided by a Skilled Nursing Facility, for days 21 through 100 in each Benefit period." (Sumortin aff., Ex. B § 5(d)). Unlike the 1993 Plan, the 1994 Plan defined "Skilled Nursing Facility" as "an institution that, for a fee, furnishes room and board and skilled nursing and related services and is approved for the provision of services under the Medicare program." (*Id.* § 10(t)). The 1994 Plan was identical to the 1993 Plan in that it capped all covered expenses under the plan at $1,000,000. (*Id.* § 7(b)).

3. *Chevron's Newsletters Concerning the Plan*

Met Life notes that Chevron periodically mailed to Plan beneficiaries summaries and descriptions of the Plan's scope. For example, in 1987 Chevron mailed to certain Plan beneficiaries a document entitled *Your Benefits in Retirement*. This document, which was mailed to McCall, stated that the "plan pays 100% of charges up to 100 days in a calendar year in a skilled nursing facility." (Potts dec. ¶ 10; Potts dec. attachment at 23).

In October and December of 1993, Chevron mailed to certain Plan beneficiaries a newsletter entitled *Chevron Retirees' Benefits News* to explain changes that would accompany the 1994 Plan. According to McCall's son, those mailings were received at the McCall home. (Opderbeck dec., Ex. L.; McCall dep. at 14). The October mailing explained:

For skilled nursing care facilities, the plan will pay for covered services if the facility is a "Medicare provider." A Medicare provider is a facility or agency that has been certified by Medicare and is eligible to receive payments from Medicare.

For days 21–100, the plan will pay 80% of covered Medicare-approved charges that Medicare does not pay. (Medicare pays the approved cost of care for days 1–20. Neither Medicare nor the new plan covers care beyond 100 days.)

(Gibson dec. October attachment at 5). The December mailing contained similar language. (Gibson dec. December attachment at 2).

C. *McCall's Medical Treatment. Costs Incurred, Insurance Coverage. and Institution of Suit*

On a date not revealed in the record, McCall began obtaining treatment at West Jersey Hospital for lung disease. In July 1993, the hospital contacted Meadow View because the hospital was looking to discharge McCall and wanted to place her in an alternate health-care facility. (Greenberg dep. at 70). McCall had become ventilator-dependant, and Meadow View offered a ventilator unit staffed with registered nurses and respiratory therapists. (*Id.* at 126–27).

At this time, the 1993 Plan was in effect. As Met Life now concedes, Meadow View qualified as a "Skilled Nursing Facility" under the 1993 Plan. (Met. Life Br. in support of sum. jud. at 7). However, the Plan only covered costs incurred during the first 100 days of treatment at such a facility. (Williams aff., Ex. A § 7(b)(1)).

In order to determine whether McCall would be able to pay her medical bills if admitted to Meadow View, Jane Greenberg, Meadow View's Administrator, contacted Jay Reichert, a Healthmarc employee. (Greenberg dep. at 33). Greenberg believed that

Healthmarc had the authority to guarantee that the Plan would cover certain medical treatment received by a Plan beneficiary such as McCall. (*Id.* at 32). Actually, however, Healthmarc has no such authority. (Williams aff. ¶ 3; Reichert dep. at 83–84). In any event, Greenberg questioned Reichert about insurance coverage for McCall's proposed stay at Meadow View, and Reichert allegedly informed Greenberg that McCall's treatment at Meadow View would be covered by the Plan's $1,000,000 "major medical insurance policy," through an "out-of-contract agreement." (Greenberg dep. at 34). The "major medical" policy to which Reichert allegedly referred was the 1993 Plan's $1,000,000 cap. Although, under the Plan, that $1,000,000 figure was only a cap on otherwise "covered" medical costs, Reichert allegedly informed Greenberg that McCall's medical bills would be paid directly out of that $1,000,000 cap without regard to whether the charges were otherwise covered under the 1993 Plan.

Reichert provided to Greenberg the name of Kathy Booker, a Met Life employee, as someone that Greenberg could call to verify coverage and to ask how much of the $1,000,000 policy was still "intact" and available. (Greenberg dep. at 35–36). Near the end of July 1993, Greenberg called Booker, who gave her "essentially, the same information [as did Reichert] about the deductibles; the million-dollar Major Medical, and that it was, essentially, unused at that point." (*Id.* at 36–37).

According to Greenberg, a day or two after she spoke with Booker, she was contacted by David Powers, another Met Life employee. Powers needed information from Greenberg concerning Meadow View. Powers allegedly mentioned to Greenberg that McCall would be covered "under her Major Medical Policy." (*Id.* at 113). In his deposition, Powers testified that he has no recollection of this alleged conversation. (Powers dep. at 16).

Greenberg subsequently called Reichert back, informed him that McCall would be admitted at Meadow View, and told him that she would prepare a letter of agreement to be signed by the party responsible for McCall's medical bills. (Greenberg dep. at

39). Greenberg testified at her deposition in this case that Reichert told her "to send that letter to him, because he had the authority to sign it." (*Id.*). During his deposition, however, Reichert disputed Greenberg's allegations, and noted that during his conversation with Greenberg he read her a disclaimer that indicated that he had no authority to sign the letter that Greenberg was proposing. (Reichert dep. at 45, 48–49).

Greenberg mailed the letter to Reichert on August 9, 1993. The letter provided, in part:

This letter will confirm our understanding regarding the placement of [McCall] in the Respiratory Care Unit at Meadow View Nursing & Convalescent Center:

. . . . .

2. Metropolitan Life, through its Case Management Company, Healthmarc, has approved coverage for this patient at Meadow View, Respiratory Care Unit.

3. The current per diem is [$790.00] . . . .

. . . . .

9. It is our understanding that Mrs. McCall's major medical has [a] $250.00 deductible, there is 80% coverage on the first $7,500.00 and *then 100% coverage as long as the stay is medically necessary.*

(Opderbeck dep., Ex. H) (emphasis added). At her deposition, Greenberg conceded that she did not specifically ask Reichert whether he had the authority to sign an agreement superseding the Plan, and that she did not ask anyone at Met Life whether Reichert had such authority. (Greenberg dep. at 170–71). She was also aware that "major medical" policies sometimes contain restrictions concerning what types of expenses are covered by the policy, and she knew of six or seven instances where benefits were subject to a 100-day cap. (*Id.* at 154–56, 172). For his part, Reichert testified at his deposition that he did not provide Greenberg with the information that Greenberg set forth in the August 9 letter. (Reichert dep. at 49).

On August 10, 1993, McCall was admitted at Meadow View. However, Reichert did not return Greenberg's letter to her with his signature until nearly four months later, on

December 1, 1993. (Reichert dep. at 48). When asked at his deposition why he signed the letter and returned it despite the fact that he did not have the authority to do so, Reichert stated, "I don't really remember why I signed it. It was either on my desk, had been there for a long time and I wanted to get rid of it." (*Id.* at 51). Michael Norbury, Meadow View's Director of Corporate Receivables, explained in his deposition that when he received the letter, he never asked Reichert whether he had the authority to execute contracts on behalf of Met Life, but instead assumed that he did based on the fact that he had signed the letter. (Norbury dep. at 127, 188).

McCall was discharged from Meadow View on November 21, 1993, 103 days after her initial admission. However, in December McCall was readmitted to the nursing home for thirteen additional days. (Williams aff. ¶ 9).

On November 30, 1993, Healthmarc mailed to Meadow View a review letter concerning services rendered to McCall. The letter concluded that those services were "recommended as medically necessary/efficient." (Opderbeck dec., Ex. I). The letter noted that "Healthmarc's recommendation is not a decision regarding payment of a particular claim. Your medical plan payer is responsible for making final payment and eligibility decisions and will consider this recommendation when determining coverage levels." (*Id.*). Michael Norbury read this letter, or another one like it, in January 1994, and at that point learned that Healthmarc does not have the authority to make decisions concerning insurance coverage under the Plan. (Norbury dep. at 29–31). In addition, in December 1993 or January 1994, McCall and Norbury received from Met Life a billing statement noting that "the maximum benefit of 100 days of Skilled Nursing Facility charges has been paid." (Williams aff. ¶ 13 & Ex. B; Norbury dep. at 32).

On January 18, 1994, McCall was admitted to Meadow View for a third time. (Williams aff. ¶ 14). By this time, McCall was insured

under the 1994 Plan instead of the 1993 Plan. As noted, the 1994 Plan differed from the 1993 Plan in that it did not cover any charges incurred at nursing facilities that were not Medicare-certified. (Sumortin aff., Ex. B § 10(t)). It is undisputed that Meadow-View's ventilator care is not Medicare-certified. (Greenberg dep. at 126; Meadow View Amend. Compl., Ex. A ¶ 13). Thus, whereas the 1993 Plan covered McCall's first 100 days at Meadow View that year, the 1994 Plan would not cover any of McCall's expenses incurred at that facility.

Pursuant to the 1993 Plan, Met Life paid Meadow View for services rendered to McCall during her first 100 days of treatment at Meadow View in 1993. (Norbury dep. at 64). Met Life also paid Meadow View for 100 days of treatment of McCall in 1994. (*Id.* at 108).[1] Acknowledging that there had been a mix-up, Healthmarc and Met Life subsequently explained to Meadow View that Jay Reichert did not have the authority to sign Greenberg's August 9 letter and that the Plan would no longer cover treatment received by McCall at Meadow View. (Meadow View sum. jud. br. Ex. R, letter from Norbury to Met Life; Meadow View sum. jud. br. Ex. T, letter from Healthmarc to Norbury).

On November 15, 1994, Meadow View filed a complaint in New Jersey Superior Court against Chevron, Met Life, Healthmarc, Virginia McCall, George McCall, and Daniel McCall. One week later, Virginia McCall filed a complaint in this Court against Met Life, Healthmarc, Chevron, and Meadow View. Meadow View's state-court action was subsequently removed to federal court, where it was consolidated with the suit filed by McCall. (December 9, 1994, Order for Consolidation).

In order to render herself eligible for Medicaid, McCall paid Meadow View $69,000, and, in exchange, Meadow View relinquished its legal claims against McCall. (Meadow View Amend. Compl., Count VII ¶ 2; Norbury dep. at 102). As part of the settlement agreement, McCall also assigned all of her

---

1. Met Life now seeks restitution for any payments it made to Meadow View for treatment received by McCall in 1994. Met Life argues that under the 1994 Plan, McCall was not covered for any medical expenses incurred at Meadow View.

rights and interest in this litigation to Meadow View. (Meadow View Amend. Compl., Count VII ¶ 2). At that point, McCall became eligible for Medicaid, which paid McCall's medical bills incurred at Meadow View from then until her death on April 14, 1996. (Norbury dep. at 102). The per diem rate paid by Medicaid to Meadow View for McCall's treatment was substantially less than the $790 per diem rate that Meadow View had charged the Plan.

On November 22, 1995, Meadow View amended its complaint. The amended Meadow View complaint and the McCall complaint allege, among other causes of action, that defendants' conduct violated ERISA, 29 U.S.C. 1001, *et seq.*, constituted a breach of the contract agreed to by Reichert and other agents of the defendants, and constituted negligent misrepresentation.

Met Life subsequently filed a counterclaim against Meadow View. Met Life contends that because Meadow View is not Medicare-certified, Meadow View does not qualify as a "Skilled Nursing Facility" as that term is defined in the 1994 Plan. Met Life thus argues that its 1994 payments to Meadow View for McCall's first 100 days of treatment that year were made in error, and that McCall was not entitled to any coverage for services provided at Meadow View under the 1994 Plan. Met Life seeks restitution for the $79,000 it paid to Meadow View for services rendered to McCall that year.

Met Life and Meadow View then simultaneously moved for summary judgment. Met Life contends that ERISA preempts all of plaintiffs' state-law causes of action, and that plaintiffs have no viable cause of action under ERISA itself. Met Life further argues that even if ERISA does not preempt plaintiffs' state-law claims, those claims are patently without merit. Met Life also contends that it is entitled to summary judgment on its restitution claim. Healthmarc subsequently joined in Met Life's summary judgment motion. (Letter by David Luvara dated July 17, 1996).

Meadow View's brief in support of summary judgment argues that Meadow View is entitled to summary judgment based on plaintiffs' arguments concerning estoppel and breach of contract. Meadow View also seeks attorney fees pursuant to 29 U.S.C. § 1132(g)(1) of ERISA. Although she has assigned of all her rights in this litigation to Meadow View, McCall purports to join in Meadow View's summary judgment motion. (Letter by Richard Cohen dated July 16, 1996).[2]

## II. *The Summary Judgment Motion Brought by Met Life and Healthmarc*

### A. *Summary Judgment Standard*

A court may grant summary judgment when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir.1986); *Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir.1983). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *See Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. *Id.* Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id.*

In deciding whether there is a disputed issue of material fact the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080–81 (3d Cir. 1996); *Kowalski v. L & F Products*, 82 F.3d 1283, 1288 (3d Cir.1996); *Meyer v. Riegel Products Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). The threshold inquiry is whether there are "any genuine factual issues that properly can be

---

2. Also, the record indicates that Mrs. McCall passed away prior to her attorney's July 16 letter, and that McCall's estate has not moved to act in place of McCall in this litigation, contrary to Rule 25(a)(1), Fed.R.Civ.P.

**1180**

resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. at 2511; *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 329–330 (3d Cir.1995) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510) ("[T]he nonmoving party creates a genuine issue of material fact if it provides sufficient evidence to allow a reasonable jury to find for him at trial.").

The moving party always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party ultimately would have the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Jalil v. Avdel Corp.*, 873 F.2d 701, 706 (3d Cir.1989), *cert. denied*, 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990). However,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden if proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders other facts immaterial.

*Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552. In such situations, "the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554; *Brewer*, 72 F.3d at 329–330 (citing *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53) ("When the nonmoving party bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial.").

The non-moving party "may not rest upon the mere allegations or denials of" its pleading in order to show the existence of a genuine issue. Fed.R.Civ.P. 56(e). It must do more than rely only "upon bare assertions, conclusory allegations or suspicions." *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir.), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985) (citation omitted); *see Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Celotex*, 477 U.S. at 324–25, 106 S.Ct. at 2553–54. Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

**B.** *Plaintiffs' ERISA–Based Claims*

In their motion for summary judgment, Met Life and Healthmarc contend that they are entitled to judgment on any ERISA-based claims brought by plaintiffs because ERISA offers no relief to plaintiffs in this case. The Court agrees.

**1.** *Plaintiffs' Right to Recover under the Terms of the Plan*

In enacting ERISA, Congress sought to "assure the equitable character of employee benefit plans and their financial soundness." *Moench v. Robertson*, 62 F.3d 553, 560 (3d Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 917, 133 L.Ed.2d 847 (1996) (internal quotations and citations omitted); *see Kemmerer v. ICI Americas Inc.*, 70 F.3d 281, 286 (3d Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1826, 134 L.Ed.2d 931 (1996); *Dade v. North American Philips Corp.*, 68 F.3d 1558, 1562 (3d Cir.1995); *In re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation*, 58 F.3d 896, 901 (3d Cir.1995) ("ERISA is a comprehensive statute enacted to promote the interests of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits.") (internal quotations omitted). As such, the statute, pursuant to 29 U.S.C. § 1132(a)(1)(B), affords a cause of action to any participant or beneficiary of a plan seeking to recover bene-

fits or enforce rights under the terms of the plan.[3] *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 108, 109 S.Ct. 948, 953, 103 L.Ed.2d 80 (1989); *Taylor v. Continental Group Change in Control Severance Pay Plan,* 933 F.2d 1227, 1231 (3d Cir.1991); *McLain v. Metropolitan Life Ins. Co.,* 820 F.Supp. 169, 174 (D.N.J.1993) ("Section 1132 of ERISA allows a participant or beneficiary to bring suit to recover benefits under a plan."). The plan at issue in this case is a health insurance plan, which provides "medical, surgical or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment." 29 U.S.C. § 1002(1).

In this case in which plaintiffs are challenging a benefit determination made by the plan administrator, the appropriate standard of the Court's review turns on the language of the Plan itself. In *Firestone Tire & Rubber Co. v. Bruch,* the Supreme Court, guided by principles of trust law, concluded that for actions grounded in section 1132(a)(1)(B), "a denial of benefits ... is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. at 115, 109 S.Ct. at 956–57. If the plan provides the trustee with discretionary authority to determine a participant's eligibility for benefits, the arbitrary and capricious standard applies. *Id.* at 111, 109 S.Ct. at 954–55 (" 'Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion.' ") (quoting Restatement (Second) of Trusts § 187 (1959)); *see Hullett v. Towers, Perrin, Forster & Crosby, Inc.,* 38 F.3d 107, 114 (3d Cir.1994); *Gillis v. Hoechst Celanese Corp.,* 4

F.3d 1137, 1140–41 (3d Cir.1993), *cert. denied,* 511 U.S. 1004, 114 S.Ct. 1369, 128 L.Ed.2d 46 (1994); *Abnathya v. Hoffmann–LaRoche. Inc.,* 2 F.3d 40, 45 (3d Cir.1993); *Nazay v. Miller,* 949 F.2d 1323, 1335 (3d Cir.1991); *Personnel Pool of Ocean County, Inc. v. Trustees of Heavy and General Laborers' Welfare Fund of New Jersey, Locals 472–172,* 899 F.Supp. 1362, 1371 (D.N.J. 1995). The trust instrument need not expressly grant discretionary authority; such discretion may be implied through the terms of the plan. *See Hullett,* 38 F.3d at 114; *Luby v. Teamsters Health Welfare & Pension Trust Funds,* 944 F.2d 1176, 1181 (3d Cir.1991).

In this case, as noted, the Plan explicitly grants to Chevron or its designee "full, exclusive and discretionary authority to ... construe the terms of the Plan and determine all issues relating to coverage and eligibility for benefits and take such other action to administer the Plan as it deems appropriate in its sole discretion." (Sumortin aff., Ex. A § 11(b)). Chevron has designated to Met Life the discretionary authority to review claims for benefits under the Plan. (Sumortin aff., Ex. A § 14, Ex. C, Ex. D). Thus, Met Life has been accorded discretionary authority within the meaning of *Firestone* and its progeny.

As a result of this grant of authority, the Court's analysis is guided by the arbitrary and capricious standard. *See Abnathya,* 2 F.3d at 40.[4] Under that standard, which is similar to the abuse of discretion standard, a court may conclude that a plan administrator's determination is arbitrary and capricious only if the determination is " 'without reason, unsupported by substantial evidence or erroneous as a matter of law.' " *Id.* (quoting *Adamo v. Anchor Hock-*

---

**3.** 29 U.S.C. § 1132(a)(1)(B) states that: "A civil action may be brought ... by a participant or beneficiary ... to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

**4.** A modified arbitrary and capricious standard may be applied where sufficient facts are adduced to demonstrate that the plan Administrator had a conflict of interest in making a benefit

determination. *See Kotrosits v. GATX Corp. Non–Contributory Pension Plan for Salaried Employees,* 970 F.2d 1165, 1173 (3d Cir.), *cert. denied,* 506 U.S. 1021, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992) ("where such party shows the kind of conflict of interest that could realistically be expected to bias the decision makers, [*Firestone*] counsels in favor of withholding deference"). No such conflict of interest has been alleged in the case *sub judice.*

*ing Corp.,* 720 F.Supp. 491, 500 (W.D.Pa. 1989)). This review is necessarily narrow in view of the policies underlying the decision in *Firestone,* and this Court " 'is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." ' *Id.* (quoting *Lucash v. Strick Corp.,* 602 F.Supp. 430, 434 (E.D.Pa.1984), aff'd, 760 F.2d 259 (3d Cir.1985)); *see Moats v. United Mine Workers of America Health & Retirement Funds,* 981 F.2d 685, 688 (3d Cir.1992) (noting that plan administrator's interpretation "should be upheld even if the court disagrees with it, so long as the interpretation is rationally related to a valid plan purpose and not contrary to the plain language of the plan"); *Scarinci v. Ciccia,* 880 F.Supp. 359, 366 (E.D.Pa.1995).

Drawing upon a standard articulated by the Eighth Circuit Court of Appeals, the Third Circuit has adopted a series of factors for this Court to consider in determining whether the plan administrator's interpretation of the plan's terms was reasonable. *See Moench,* 62 F.3d at 566. Those factors include:

> "(1) whether the interpretation is consistent with the goals of the plan; (2) whether it renders any language in the plan meaningless or internally inconsistent; (3) whether it conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the [administrator] interpreted the provision at issue consistently; and (5) whether the interpretation is contrary to the clear language of the plan." [5]

*Id.* (quoting *Cooper Tire & Rubber Co. v. St. Paul Fire & Marine Ins. Co.,* 48 F.3d 365, 371 (8th Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 300, 133 L.Ed.2d 205); *see Kenne-*

*dy v. Georgia–Pacific,* 31 F.3d 606, 609 (8th Cir.1994); *Finley v. Special Agents Mut. Benefit Ass'n,* 957 F.2d 617, 621 (8th Cir. 1992). No single factor is dispositive, and this Court must examine the factors as a whole in making a determination.

■ An analysis of the *Moench* factors in this case confirms that Met Life's denial of benefits to McCall *under the terms of the Plan* was not arbitrary and capricious. Most significantly, under the fifth *Moench* factor, an analysis of the plain language of the 1993 Plan and the 1994 Plan indicates that McCall was not entitled to any payments from the Plan beyond the payments actually made by the Plan to Meadow View. The 1993 Plan unequivocally limited coverage for costs incurred at a "Skilled Nursing Facility" to services received during the first 100 days of treatment in such a facility each calendar year. (Williams aff., Ex. A § 7(b)(1)). Thus, the terms of the 1993 Plan support Met Life's determination that McCall was only covered for her first 100 days of treatment at Meadow View in 1993.[6]

Under the plain language of the 1994 Plan, Met Life would have been justified in denying any coverage for expenses incurred by McCall at Meadow View. The 1994 Plan defines "Skilled Nursing Facility" as "an institution that, for a fee, furnishes room and board and skilled nursing and related services *and is approved for the provision of services under the Medicare program." (Id.* § 10(t)) (emphasis added). Meadow View is not Medicare-certified, and thus the 1994 Plan did not insure McCall for medical costs incurred at that facility. (Greenberg dep. at 126; Meadow View Amend. Compl., Ex. A ¶ 13).

---

5. Although this list of factors was articulated by the court in *Moench* in the context of determining whether a fiduciary abused his discretion by investing employee assets solely in employer securities pursuant to an employee stock option plan, the factors are equally applicable to reviewing a decision to deny benefits under section 1132(a)(1)(B), and, indeed, the factors have been applied as such in exactly this context. *See Lockhart v. United Mine Workers of America 1974 Pension Trust,* 5 F.3d 74, 77–78 (4th Cir.1993); *Finley,* 957 F.2d at 621; *Personnel Pool of Ocean County, Inc.,* 899 F.Supp. at 1371.

6. Meadow View notes that section 7(z) of the 1993 Plan provided for coverage of certain medical costs incurred that were not a "Covered Charge" as defined by the Plan. However, coverage of such costs required pre-treatment approval by the Chevron Board of Directors. (Williams aff., Ex. A § 7(z)(vi)). Because there was no such approval in this case, Meadow View's contention is without merit.

These provisions in the 1993 Plan and the 1994 Plan indicate that Met Life did not contravene the plain language of those plans in ceasing to make payments to Meadow View on behalf of McCall. Meadow View has not presented any language or provisions in the plans that would contradict such a conclusion.

Turning to the first three *Moench* factors, Meadow View has not pointed to any Plan policy that conflicts with Met Life's administration of the Plan, any language in the Plan rendered meaningless by Met Life's interpretation, any pertinent conflicts in the language of the Plan, or any provisions of the ERISA statute that conflict with Met Life's administration of the Plan. None of these factors suggest that Met Life's interpretation of the Plan's terms has been arbitrary or capricious.

Although Meadow View does not make the point[7], one could argue that the fourth *Moench* factor—whether the plan administrator interpreted the provision in question consistently—weakens Met Life's argument that it has interpreted the Plan reasonably. Met Life employees allegedly represented initially that McCall would be covered for the vast majority of treatment received at Meadow View, then coverage was limited to 100 days of treatment for each year, and now Met Life contends that McCall was not covered for any expenses incurred at Meadow View since the adoption of the 1994 Plan.

In any event, the remaining *Moench* factors, which favor a finding a reasonableness, mandate that Met Life's motion for summary judgment should be granted as to plaintiffs' claims brought pursuant to 29 U.S.C. § 1132(a)(1)(B) of ERISA. When scrutiny is confined to the provisions of the Plan, as required in this ERISA cause of action, no reasonable fact-finder could conclude that Met Life's denial of further benefits to McCall under the unambiguous terms of the Plan was arbitrary and capricious. *See Firestone*, 489 U.S. at 115, 109 S.Ct. at 956–57; *Abnathya*, 2 F.3d at 45. There are no material facts in dispute in this area, and it is apparent that Met Life is entitled to judgment as a matter of law on this point. That conclusion is supported by the fact that the most important *Moench* factor, the plain language of the plan, points unequivocally to a finding of reasonableness in this case. *See Lockhart*, 5 F.3d at 78 ("The award of benefits under any ERISA plan is governed in the first instance by the language of the plan itself."); *Callahan v. Rouge Steel Co.*, 941 F.2d 456, 460 (6th Cir.1991); *see also Lickteig v. Business Men's Assurance Co. of Am.*, 61 F.3d 579, 585 (8th Cir.1995) (according "significant weight" to unambiguous plan language). Meadow View has not met its summary judgment burden. *See Celotex*, 477 U.S. at 322–25, 106 S.Ct. at 2552–54.

### 2. Equitable Estoppel Under ERISA

In addition to the cause of action set forth in 29 U.S.C. § 1132(a)(1)(B), discussed *supra*, ERISA also provides to ERISA "participants" and "beneficiaries" the right to "obtain other appropriate equitable relief." 29 U.S.C. § 1132(a)(3)(B). Meadow View may not bring an action under 29 U.S.C. § 1132(a)(3)(B) in its own name because it is not a "participant" or "beneficiary" as defined by ERISA. *See* 29 U.S.C. § 1002(7),(8); *Cameron Manor, Inc. v. United Mine Workers of Am.*, 575 F.Supp. 1243, 1245–46 (W.D.Pa.1983) (holding that nursing home was not ERISA participant or beneficiary). However, McCall's complaint contained a count that could be read as invoking 29 U.S.C. § 1132(a)(3)(B). Specifically, McCall sought to have Chevron, Met Life and Healthmarc "estop[ped] ... from disclaiming coverage for [McCall's] reasonable medical care and treatment." (McCall Compl. ¶ 25). McCall subsequently assigned that claim to Meadow View. (Meadow View Amend. Compl., Count VII ¶ 2).

Plaintiffs' estoppel claim fails, however, because a plaintiff may not bring an equitable estoppel claim under ERISA in an attempt to circumvent the ERISA provisions precluding oral or informal amendments to ERISA plans. *See Curcio v. John Hancock*

---

7. Indeed, in its moving and responsive papers, Meadow View makes no mention of the *Moench* factors.

*Mut. Life Ins. Co.*, 33 F.3d 226, 236 n. 17 (3d Cir.1994). Such circumvention is exactly what plaintiffs are attempting in this case, as they have supported their estoppel claim by pointing to oral statements made by Met Life employees and the letter signed by Reichert, who was without authority to amend the Plan. ERISA's ban on oral amendments and amendments not made in accordance with the amendment provisions set forth in the plan itself is intended to ensure that the terms of an ERISA plan are the sole determinant of whether a beneficiary is entitled to benefits under the plan. *See Frank v. Colt Indus., Inc.*, 910 F.2d 90, 97 (3d Cir.1990) (citing ERISA's legislative history). Plaintiffs may not subvert that aim by cloaking their cause of action in the language of equitable estoppel. *See Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 58–59 (4th Cir. 1992), *cert. denied*, 506 U.S. 1081, 113 S.Ct. 1051, 122 L.Ed.2d 359 (1993); *see also Kane v. Aetna Life Ins.*, 893 F.2d 1283, 1285 n. 3 (11th Cir.) (noting that estoppel may not be invoked to enlarge or extend the coverage specified in a contract), *cert. denied*, 498 U.S. 890, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990). Met Life and Healthmarc are therefore entitled to summary judgment on plaintiffs' equitable estoppel claims.[8]

### C. *Plaintiffs' State Law Claims*

#### 1. *Whether Plaintiffs' State Law Causes of Action Are Preempted by ERISA*

As noted, plaintiffs' complaints raise claims of breach of contract and negligent misrepresentation under the law of the State of New Jersey. Met Life and Healthmarc contend that these claims are preempted by ERISA.

The relevant ERISA provision states: "[T]he provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section

---

8. As an alternate basis for its holding, the Court notes that dictum in a Third Circuit case indicates that a health-care provider such as Meadow View, which is not a "participant" or "beneficiary" as defined by ERISA, may not bring any suit under ERISA, even as assignee of the rights of an ERISA "beneficiary" or "participant." *See*

1003(b) of this title." 29 U.S.C. § 1144. In accordance with this "deliberately expansive" language, *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987), ERISA has been construed to preempt a broad range of state law claims. *See, e.g., Pane v. RCA Corp.*, 868 F.2d 631 (3d Cir.1989) (holding that state law claims of breach of contract, breach of covenants of good faith and fair dealing, and intentional infliction of emotional distress were preempted by ERISA); *Cote v. Durham Life Ins. Co.*, 754 F.Supp. 18 (D.Conn.1991) (holding that ERISA preempted state law claims of breach of contract, bad faith, unfair insurance practices, and intentional infliction of emotional distress).

The ERISA preemption clause aims to establish employee-benefit-plan regulation " 'as exclusively a federal concern.' " *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987) (quoting *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981)). Thus, the phrase "relate to" in 29 U.S.C. § 1144 "has been given the broadest common sense meaning, such that a state law 'relates to' a benefit plan if it has a connection with or reference to such a plan." *Shiffler v. Equitable Life Assurance Soc'y*, 838 F.2d 78, 81 (3d Cir.1988). A state law may be found to "relate to" a benefit plan "even if the law was not specifically designed to affect such plans, or the effect is only indirect." *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 139, 111 S.Ct. 478, 483, 112 L.Ed.2d 474 (1990). As the Supreme Court has explained,

> [T]he detailed provisions of [ERISA] set forth a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formulation of employee benefit plans. The policy

*Northeast Dep't ILGWU Health & Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund*, 764 F.2d 147, 154 n. 6 (3d Cir.1985) ("Congress simply made no provision ... for persons other than participants and beneficiaries to sue, including persons purporting to sue on their behalf.")

choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA.

*Pilot Life Ins. Co.,* 481 U.S. at 54, 107 S.Ct. at 1556.

■ The law is thus firmly established that ERISA preempts *an insured's* attempt to bring state-law causes of action seeking, in effect, to overrule a defendant's denial of benefits under an ERISA plan. *See. e.g, Berger v. Edgewater Steel Co.,* 911 F.2d 911, 923 (3d Cir.1990) (holding that ERISA preempts employees' state-law misrepresentation claims), *cert. denied,* 499 U.S. 920, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991); *Shiffler,* 838 F.2d at 81–82.

This case, however, presents a different, more difficult question: whether certain state-law causes of action are preempted by ERISA when brought by a third-party health care provider such as Meadow View. The parties have not cited, and the Court has not found, any decisions from the Third Circuit that squarely address this issue. Certainly, the mere fact that suit is brought by a health care provider instead of an insured does not remove the suit from the purview of ERISA's preemption clause. If so, an insured could thwart ERISA's regulatory scheme simply by assigning her claims to her health care provider. Such a result could not be what Congress intended in designing ERISA's preemption language. *See Pilot Life Ins. Co.,* 481 U.S. at 45, 107 S.Ct. at 1551–52 (stating that issue of whether certain state action is preempted by federal law turns on congressional intent). On the other hand, health care providers such as Meadow View are not "beneficiaries" or "participants" as defined by ERISA, and thus these entities may not seek relief in their own name under the ERISA statute itself. *See* 29 U.S.C. § 1002(7),(8); 29 U.S.C. § 1132(a)(1). Thus, reading ERISA's preemption provision too broadly could, in some instances, strip health care providers of any means of redressing tortious or otherwise improper conduct by a party that administers an employee-benefit plan.

There has been apparent agreement among courts that certain state-law causes of action, even if brought by a health-care provider, are so closely related to an ERISA plan and an insured's attempt to receive coverage under that plan that those causes of action are preempted by the ERISA scheme. *See, e.g., Memorial Hosp. Sys. v. Northbrook Life Ins. Co.,* 904 F.2d 236, 239 (5th Cir. 1990); *Charter Fairmount Inst., Inc. v. Alta Health Strategies,* 835 F.Supp. 233, 239–40 (E.D.Pa.1993). Such claims, which include claims that have been assigned by insureds to their health care provider, have been referred to as "derivative claims" because they derive from the insured's attempt to receive benefits under an employee benefit plan.

■ In this case, the Court concludes that plaintiffs' breach of contract claim is a derivative claim that "relates to" the Chevron ERISA Plan and is thus preempted by the ERISA statute. The breach of contract claim is essentially an effort by plaintiffs to secure benefits beyond those authorized by the Plan on the basis of oral representations made by Healthmarc and Met Life employees and the letter signed by Reichert. However, as noted, ERISA explicitly prohibits oral modifications of employee benefit plans. *See* 29 U.S.C. § 1102(a)(1); *Frank v. Colt Indus., Inc.,* 910 F.2d 90, 98 (3d Cir.1990). Similarly, ERISA requires that any written amendments to a plan be carried out in accordance with amendment procedures set forth in the plan itself, *see* 29 U.S.C. § 1102(b); *Frank,* 910 F.2d at 98, and in this case, neither Reichert nor anyone at Healthmarc had the authority to amend the Plan pursuant to the Plan's amendment provisions. (Sumortin aff., Ex. A § 15). As discussed previously, ERISA strives to create a regime under which the terms of a plan are the sole determinant of whether a plan beneficiary is entitled to benefits in a particular situation. *See Frank,* 910 F.2d at 97. To allow plaintiffs to proceed with their breach of contract claim would thwart that objective, and thus preemption is appropriate in this case.

Significantly, the count in which plaintiffs seek damages from Met Life and Healthmarc stemming from an alleged breach of contract is found in McCall's complaint, and not that of Meadow View. It is thus apparent that any breach of contract claims by Meadow View against the defendants emanate from McCall's assignment of her rights in this litigation. These assigned claims are obviously "derivative" and therefore preempted. The Court grants the motion by Met Life and Healthmarc for summary judgment on plaintiffs' breach of contract claims.

The question whether ERISA preempts Meadow View's claim of negligent misrepresentation requires separate analysis. Federal courts have arrived at conflicting results in determining whether ERISA preempts negligent misrepresentation claims brought by health care providers in cases similar to this one. *Compare Cromwell v. Equicor–Equitable HCA Corp.*, 944 F.2d 1272 (6th Cir.1991) (holding that ERISA preempted health care provider's negligent misrepresentation claim against employee-benefit plan) *and National Alcoholism Programs v. Palm Springs Hosp. Employee Benefit Plan*, 825 F.Supp. 299 (S.D.Fla.1993) (similar) *with Memorial Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236 (5th Cir. 1990) (holding that ERISA did not preempt hospital's negligent misrepresentation claim against insurance company that administered employee benefit plan) *and Lordmann Enters., Inc. v. Equicor, Inc.*, 32 F.3d 1529 (11th Cir.1994) (same), *cert. denied,* —— U.S. ——, 116 S.Ct. 335, 133 L.Ed.2d 234 (1995). Under the law of New Jersey, to prove a claim of negligent misrepresentation, a plaintiff must demonstrate that: 1) the defendant negligently provided false information; 2) the plaintiff was a reasonably foreseeable recipient of that information; 3) the plaintiff justifiably relied on the information; and 4) the false statements were a proximate cause of the plaintiff's damages. *See Karu v. Feldman*, 119 N.J. 135, 146–47, 574 A.2d 420 (1990); *H. Rosenblum Inc. v. Adler*, 93 N.J. 324, 334, 461 A.2d 138 (1983).

In this case, the Court concludes that Meadow View's negligent misrepresentation claims against Met Life and Healthmarc are sufficiently removed from McCall's efforts to obtain benefits from the Plan to avoid the scope of ERISA preemption. Unlike McCall's contract-based claim for Plan benefits, Meadow View's negligent misrepresentation claim is a tort action that is brought in Meadow View's own name, is independent of the Plan, and could have been brought even if the Plan did not exist. Indeed, Meadow View brings that claim against Met Life and Healthmarc only, and not the Plan itself. Thus, if Meadow View were able to prevail on its misrepresentation claim, any economic impact on the ERISA plan at issue in this case would be indirect and attenuated.

Health care providers such as Meadow View are neither "beneficiaries" nor "participants" under the ERISA statute. Thus, such health care-providers are not able to bring suit in their own name under ERISA. As a result, if ERISA's preemption provision is construed as broadly as Met Life and Healthmarc urge, health care providers such as Meadow View would be stripped of the right to bring suit for tortious conduct such as that which allegedly occurred in this case, where negligent misrepresentations by private claims reviewers to health care providers induce the providers to render extended medical services and care. Because ERISA does not address the issue of health care providers' ability to bring tort actions, *see Lordmann Enters., Inc.*, 32 F.3d at 1533 (noting that health care providers were not part of the ERISA "bargain" and that such parties are beyond ERISA's scope), the Court is unable to discern from the statute the congressional intent to preclude a party such as Meadow View from bringing a misrepresentation claim in this type of case against a plan administrator like Met Life and a health care manager like Healthmarc.

There are also pragmatic justifications for the Court's conclusion. In determining whether a patient is eligible for coverage under a health care plan, health care providers customarily verify the patient's coverage with the insurer's agents. *See Memorial Hosp. Sys.*, 904 F.2d at 246. If coverage is confirmed, the patient is generally admitted "without further ado." *Id.* The result sought by Met Life and Healthmarc in this case

would, by rendering both ERISA remedies and state-law remedies unavailable to health care providers, effectively immunize such health care managers and plan administrators from certain fraudulent and negligent misrepresentations made to health care providers. In turn, if ERISA were interpreted as precluding claims for negligent or fraudulent misrepresentations of health benefits administrators and managed care consultants to health care providers who rely upon promises of coverage, critical health care decisions would be delayed while the provider determined for itself whether its medical services would be covered under the specific terms of each prospective patient's plan. In the real world, providers place reliance upon the benefit plan interpretations of benefits administrators and managed care consultants functioning as intermediaries between the provider and the patient's benefit plan. Under the interpretation of 29 U.S.C. § 1144 espoused by Met Life and Healthmarc, such health care providers would be forced to demand payment up front or impose other costly inconveniences before admitting a patient for treatment. *See Memorial Hosp. Sys.*, 904 F.2d at 247. There is nothing in the language of ERISA or pertinent ERISA case law that compels such an inefficient result.

 Although obviously not controlling authority, principles of New Jersey common law concerning the imposition of duty shed light on the ERISA preemption analysis in this case. "The determination of the existence of a duty ultimately is a question of fairness and policy." *Snyder v. American Ass'n of Blood Banks*, 144 N.J. 269, 292, 676 A.2d 1036 (1996). An important, though not dispositive factor in the duty analysis is the foreseeability of harm to others stemming from the defendant's conduct. *Id.* Other factors to be considered include "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in imposition of a duty." *Carvalho v. Toll Bros. & Developers*, 143 N.J. 565, 573, 675 A.2d 209 (1996).

If health benefits administrators and managed care consultants fail to act reasonably in making representations concerning insurance coverage, financial harm will likely be inflicted on the medical companies that provide treatment in reliance upon promises of payment. This threatened harm, moreover, can easily be avoided if companies such as Met Life and Healthmarc ensure the accuracy of their representations or refrain from making assurances of coverage in instances in which they do not have the authority to do so. As discussed previously, health care providers are often compelled by circumstances to rely on the representations made by benefits administrators and managed care consultants. Thus, the general public and companies involved in the delivery of medical care have a vital interest in ensuring that health plan administrators and medical consultants exercise due care in making such representations concerning insurance coverage. *See Snyder*, 144 N.J. at 292, 676 A.2d 1036 (imposing on blood "clearing house" duty to exercise due care, because of reliance of hospitals and patients on defendant for safety of nation's blood supply). The Court does not read the ERISA statute as forbidding state law efforts to regulate the conduct of plan administrators and medical consultants in this area of negligent or fraudulent misrepresentation.

The Court concludes that ERISA does not preempt Meadow View's causes of action against Met Life and Healthmarc for negligent misrepresentation. Met Life and Healthmarc are not entitled to summary judgment on those counts of Meadow View's amended complaint.

### 2. The Merits of Meadow View's Negligent Misrepresentation Claim

 Met Life and Healthmarc contend that even if Meadow View's negligent misrepresentation claims are not preempted by ERISA, the record before the Court would not permit a reasonable trier of fact to find for Meadow View on those counts. The Court disagrees.

Meadow View, in order to prove its claims of negligent misrepresentation, would have to demonstrate that: 1) Met Life or Healthmarc negligently provided false information to Meadow View; 2) Meadow View was a

reasonably foreseeable recipient of that information; 3) Meadow View justifiably relied on the information; and 4) the false statements were a proximate cause of Meadow View's damages. *See Karu v. Feldman,* 119 N.J. 135, 146–47, 574 A.2d 420 (1990); *H. Rosenblum Inc. v. Adler,* 93 N.J. 324, 334, 461 A.2d 138 (1983). Defendants contend that they made no false statements in this case, but that contention is obviously without merit. A reasonable factfinder could conclude that Booker and Powers of Met Life gave Meadow View incorrect information concerning McCall's insurance coverage under the Plan. (Greenberg dep. at 36–37, 113). Similarly, a reasonable person could conclude that Reichert, a Healthmarc employee, provided incorrect statements to Meadow View, both orally and in writing, concerning McCall's health insurance coverage. (*Id.* at 34–36; Opderbeck dep., Ex. H).

Met Life and Healthmarc also argue that Meadow View's reliance on any false information that it was provided was not justified in this case. A reasonable finder of fact, however, could conclude that Meadow View was justified in relying on the assurances of insurance coverage made by Healthmarc, an entity involved (at least indirectly) with the determination of which claims are paid under the Plan, and confirmed on two occasions by Met Life, the administrator of the Plan.

Defendants further contend that even if Meadow View's reliance on defendants' representations concerning McCall's insurance coverage was reasonable initially, it became unjustified before McCall's third admission to Meadow View. They argue that by that time, Meadow View had received copies of payment recommendations from Healthmarc to Met Life that noted that Healthmarc is not responsible for making final payment decisions under the Plan. (Opderbeck dep., Ex. I). In addition, by that time, Meadow View had received from Met Life a billing statement that indicated that "the maximum benefit of 100 days of Skilled Nursing Facility charges has been paid." (Williams aff. ¶ 13 & Ex. B; Norbury dep. at 32). The Court notes, however, that none of these statements were prominently featured in the mailings sent to Meadow View. Based on the materials presently before the Court, the Court declines to conclude as a matter of law that those mailings rendered Meadow View's reliance unjustified. For example, a factfinder might properly conclude that Meadow View was justified in viewing the form letters it had received as having been trumped by the defendants' twice-confirmed assurances of an "extra-contractual agreement" in this case. Granting all reasonable favorable inferences to Meadow View, the Court concludes that Met Life and Healthmarc are not entitled to summary judgment on Meadow View's negligent misrepresentation claim.

### D. *Met Life's Restitution Claim*

■ As discussed in Section I.C of this Opinion, the 1994 Plan did not cover any medical expenses incurred by McCall at a nursing facility that was not Medicare-certified. (Sumortin aff., Ex. B § 10(t)). Meadow View is not Medicare-certified. (Greenberg dep. at 126; Meadow View Amend. Compl., Ex. A ¶ 13). Thus, whereas under the 1993 Plan Mrs. McCall would be covered for her first 100 days of treatment each year at Meadow View, under the 1994 Plan she was not covered for any of the treatment she received at that facility. Nevertheless, Met Life, perhaps not recognizing the impact of the 1994 Plan on McCall's case, directed that Meadow View be paid $79,000 for the first 100 days of McCall's treatment at Meadow View in 1994. Met Life, as fiduciary of the Chevron Plan, now seeks from Meadow View restitution for those payments.

■ The Third Circuit has held that [a]lthough ERISA itself does not explicitly provide a statutory right of restitution, it is clear that Congress intended federal courts to fashion a federal common-law under ERISA, and this permits application of a federal common-law doctrine of unjust enrichment if restitution would not override a contractual provision of an ERISA plan.

*Luby v. Teamsters Health, Welfare & Pension Trust Funds,* 944 F.2d 1176, 1186 (3d Cir.1991). This federal common law doctrine of unjust enrichment permits, for example, an ERISA fund to recover payments mistakenly made by the fund. *Id.* A district court

has the authority to order such restitution even if the incorrect payment was the result of negligence on the part of the ERISA entity that made the payment. *Id.* In determining whether restitution would be appropriate in a particular case, a district court is to "assess[ ] . . . the equities" and rely on "[g]eneral equitable principles." *Id.*

In this case, the Court's examination of the equities reveals that it would not be appropriate to grant summary judgment to Met Life on its restitution claim. A reasonable trier of fact could conclude that Meadow View accepted McCall as a patient only after making diligent inquiry and being informed by Met Life and Healthmarc employees that McCall was covered for approximately $1,000,000 of treatment at Meadow View pursuant to her "major medical" policy. One could view any subsequent payments to Meadow View that exceeded the Plan's requirements as a partial fulfillment of the initial guarantee made by Met Life and Healthmarc, on the basis of which Meadow View had accepted McCall as a patient. In such a situation, Meadow View could not be said to have been "unjustly enriched" by Met Life's 1994 payments. Rather, it merely received anticipated compensation for medical services it had provided. The Court perceives scant equitable basis to order Meadow View to return the payments in question at this time, and nothing in ERISA itself compels such a result. Met Life's motion for summary judgment on its restitution claim is denied.[9]

### III. *Meadow View's Summary Judgment Motion*

Meadow View seeks summary judgment in this case on its breach-of-contract cause of action and its estoppel cause of action.[10] As discussed in Section II.B.1 and Section II.B.2 of this opinion, however, Met Life and Healthmarc are entitled to summary judgment on those counts of plaintiffs' complaints.

The remaining motion brought by Meadow View is a request for attorney fees, made pursuant to 29 U.S.C. § 1132(g)(1). That ERISA provision states, in pertinent part: "In any action under this subchapter . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." This application is denied because Meadow View is not a prevailing party under ERISA.

### IV. *Conclusion*

Met Life and Healthmarc are granted summary judgment on plaintiffs' ERISA-based claims. Plaintiffs' cause of action brought to recover benefits due under the Plan, *see* 29 U.S.C. § 1132(a)(1)(B), is dismissed because the terms of the Plan did not insure McCall for the medical treatment in question. Plaintiffs' request for equitable relief under ERISA, *see* 29 U.S.C. § 1132(a)(3)(B), is dismissed because such a remedy may not be invoked in an attempt to modify the terms of an ERISA plan on the basis of an oral or informal agreement.

Met Life and Healthmarc are also granted summary judgment on plaintiffs' breach of contract claims, because such claims are preempted by ERISA. Meadow View's negligent misrepresentation claims, however, are not preempted, and thus summary judgment is not granted on those counts. Moreover, Met Life is not entitled to summary judgment on its claim for restitution, Met Life having demonstrated insufficient equitable justification for such a remedy.

Plaintiffs' summary judgment motion on their equitable estoppel and breach of contract claims is denied for the same reasons that Met Life and Healthmarc were granted summary judgment on those counts, namely, these claims are preempted by ERISA. Lastly, the Court denies plaintiffs' request for attorney fees.

The accompanying Order is entered.

---

**9.** That Met Life may not prevail on its restitution claim *against Meadow View does not mean that* the Plan lacks a remedy. If Met Life (and/or Healthmarc) negligently caused the Plan's funds to be paid out, the Plan may have a remedy against them.

**10.** Meadow View has not cross-moved for summary judgment on *its cause of action for negligent misrepresentation.*

**1190**

## ORDER

This matter having come before the Court upon Met Life's motion for summary judgment, pursuant to Fed.R.Civ.P. 56, as well as upon Meadow View's motion for summary judgment, pursuant to Fed.R.Civ.P. 56; and Healthmarc having joined in Met Life's summary judgment motion; and Virginia McCall having joined in Meadow View's summary judgment motion; and the Court having considered the submissions of the parties; and for the reasons stated in the Opinion of today's date;

IT IS this 16TH day of December 1996 hereby

ORDERED that Met Life and Healthmarc are **GRANTED** summary judgment on the counts of plaintiffs' complaints raising claims of breach of contract or arising under ERISA, 29 U.S.C. § 1001 *et seq.*, including plaintiffs' claim for equitable relief under ERISA; and it is

FURTHER ORDERED that Met Life and Healthmarc are **DENIED** summary judgment on the counts of Meadow View's amended complaint raising claims of negligent misrepresentation; and it is

FURTHER ORDERED that Met Life's motion for summary judgment on its restitution cause of action is hereby **DENIED;** and it is

FURTHER ORDERED that plaintiffs' motion for summary judgment and attorney fees is **DENIED;** and it is

FURTHER ORDERED that trial will take place in this case as scheduled on January 13, 1997, upon Meadow View's claims against Met Life and Healthmarc for negligent misrepresentation and upon Met Life's counterclaim against Meadow View for restitution.